**WILEY RAMEY (SB#45792)**
Attorney at Law
9520 Castillo Drive
San Simeon, CA 93452
Phone: (805)924-3010
Fax: (805)924-3011
wileyramey@aol.com

Attorney for Debtor

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA- NORTHERN DIVISION

BKS CAMBRIA, LLC.

**CASE NO.: 9:25-bk-10631**

**NOTICE OF MOTION AND MOTION TO SELL PROPERTY OF THE ESTATE AND EMPLOY REALTORS 11 USC § 363 (b)(1)(A)**

**Date: September 9, 2025**
**Time: 1:00 P.M.**
**Place: 1415 State Street Santa Barbara, California 93101**
**Courtroom 201**

DEBTOR

TO THE COURT AND TO THE UNITED STATES TRUSTEE AND TO ALL

PARTIES OF INTEREST:

Debtor BKS Cambria LLC., herewith notifies all of the above of its intention

to sell 202 Monte Cristo Place in Cambria, California, the former Air Force Base

consisting of 34 acres. The property features 6 barracks buildings, an officer's

club, a mess hall, an officer's residence, and 2 concrete pedestals previously

housing radar screens. Except for the officer's residence, the structures are

contaminated by asbestos left behind when the military abandoned the property in

approximately 1982. There is at this moment a property tax debt owed to the

County of San Luis Obispo in the amount of approximately $470,000 and there is

also a lean recorded against the property by Blizzard Energy Inc., a recently

amended judgment Debtor added to the Judgment against Bernd Schaefers in San

Luis Obispo Superior Court case number 17CVP0266. In addition, there is a Proof

of Claim filed by Bernd Schaefers, the manager of the LLC., since 2005 and a 50%

member of the LLC. The other 50% is held by his ex-wife, Karin Schaefers.

This sale will be conducted pursuant to the provisions of Title 11 § 363 (b)1

and the listing shall be $3,500,000 to commence August 15, 2025, and ran until

February 15, 2026. Real estate commissions payable to Jack Posemsky and

Richard Breen shall be 5% which would be split evenly between the two of those

entities. The property is to be listed in the multiple listing service.

Escrow would be performed as designated. It is the position of the Debtor

that the homestead claim from Mr. Schaefers should be resolved by a proceeding

to be determined in Superior Court and the proceeds necessary to satisfy the

homestead shall be retained in trust pending the outcome, while the remaining

portions of the sales proceeds would be distributed upon close of escrow.

Provisions of the California Code of Civil Procedure address the disposition of

homesteads under California Law which would be binding on the issue in any

proceeding pursued by Blizzard Energy in state Court. There is no Federal

exemption known to the Debtor, only state recognized homestead exemptions.

Attached herewith and labeled "EXHIBIT A" is the appraisal performed by Kristen

Magnussen and the listing agreements from the realtors which are labeled

"EXHIBIT B". The property appraises at $624,000 given the fact that the sales price must be reduced by $3,000,000 in order to remediate the asbestos issues. Therefore, the appraised value in terms of bank or traditional financing is $624,000, however the Debtor expects that he will do much better than this if he is in control of the marketing.

## LIQUIDATION ANALYSIS

In a liquidation proceeding, the property would be subject to no meaningful bidding procedure for it to be sold by a Chapter 7 Trustee. This is because a judgment and judgment lean are recorded against the property on behalf of Blizzard Energy which has a judgment from Kansas of $3,820,000 plus interest, which currently totals over $6,000,000. This particular judgment lean would be used as a basis for purchasing the property from a Chapter 7 Trustee, meaning no money would be exchanged. Any competitive bid would have to be in the $7,000,000 range for property, which is worth $620,000 on paper. A Chapter 7 Trustee would receive nothing as a result of this type of procedure. It should be noted that in the prior bankruptcy of Bernd Schaefers #11163 filed in the year 2019, Mr. Schaefers was employed as the caretaker of the property during the period that the Chapter 7 Trustee had authority over it and ultimately a no asset report was filed. In Chapter 7 liquidation, no other Creditor would receive anything. No administrative expenses would be paid. Blizzard Energy would not be paid; they would simply acquire Title of the property. In the event of a dismissal, Blizzard Energy would have available to it the means of enforcement

provided by the California Code of Civil Procedure 704.760. They would be required to deal with the claimed Homestead Exemption, however for Mr. Schaefers. The Debtor proposes to set aside enough to satisfy his claimed homestead and disburse the rest of the money if his Motion to sell the property is approved.

Dated: July 22, 2025                                      Respectfully submitted,

*Wiley Ramey*

_____

Wiley Ramey, Attorney for Debtor

# EXHIBIT A

# APPRAISAL REPORT

Single Family Residence on 34.16 Acres
202 Monte Cristo Place
Cambria, San Luis Obispo County, CA 93428
APN: 013-181-005



**AS OF**
June 20, 2025

**PREPARED FOR**
BKS Cambria, LLC
C/O Bernd Schaefers
berniebkscambria@outlook.com

**PREPARED BY**
Kristen M. Magnussen, AG043553
Magnussen Appraisal, LLC
1577 Berwick Drive
Cambria, CA 93428
(760) 809-7325

# MAGNUSSEN APPRAISAL

*Commercial & Residential Real Estate Valuation*

June 24, 2025

BKS Cambria, LLC
C/O Bernd Schaefers
berniebkscambria@outlook.com

Re:    Single Family Residence on 34.16 Acres
       202 Monte Cristo Place
       Cambria, San Luis Obispo County, CA 93428
       APN: 013-181-005

Greetings,

As requested, the As Is Market Value of the above referenced property is appraised herein. The Client is BKS Cambria, LLC and the intended use of this report is for potential listing/sale. The intended user is the Client and associated agents. Your attention is directed to the Scope of Work and Limiting Conditions and Assumptions sections of this report.

The subject property was inspected on June 20, 2025, which is the date of value utilized.  The subject is a 2,068 sf single-family residence on 34.16 acres in Cambria, CA. The subject has an additional 31 structures, many of which are obsolete (part of a former air force station use) needing asbestos/lead-based paint remediation/removal. There is also a 300-foot transmission tower, outbuildings, and a transmission equipment building. The transmission tower and equipment building are leased by 5 tenants, however, 3 tenants' leased fee rights are owned by a separate entity which requires the subject property owner to maintain the tower/equipment buiding until 2064. The remaining two tenants contributing to the subject's leased fee interest are a radio broadcast transmission station and an internet provider.

Although the subject is zoned Recreation, which allows some public uses (such as non-commercial conference and retreat facilities, day use activities, youth hostels, or campgrounds), documentation was provided to the appraiser that the County has denied approval of any public use due to lack of a secondary emergency exit road. The two neighboring property owners that could potentially grant an easement for this purpose have reportedly denied requests/offers.

Although up to four residences are possible with development review, the subject reportedly only has sufficient water to support one single family residence, with no possibility for additional water. Therefore, the Highest and Best Use of the subject is continued single-family residential use with ancillary transmission/broadcast use. Although the subject receives some residential/storage income, the income is short-term. As the most likely buyer is an owner/user, this income does not contribute value and is not considered in the analysis.

In addition to remediation/demolition/removal of the obsolete buildings, the transmission tower that (that the owner is required to maintain until 2064) needs replacement in 5-10 years, and 6 power transformers are nearing the end of their life, needing replacement in the near future. There are three abandoned septic/treatment tanks that contain hazardous materials requiring removal/cleaning. Further, a damaged drainage culvert needs repair.

June 24, 2025

The attached report has been prepared in conformance with the 2024-2025 Uniform Standards of Professional Appraisal Practice (USPAP), Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), and the client requirements. The appraisal utilizes the following Hypothetical Condition(s) and/or Extraordinary Assumption(s), which may have affected assignment results:

1. Due to the complexity of the remediation and demolition/removal of the subject's obsolete structures, with no professional cost estimates provided (except for asbestos remediation by Padre Associates), this appraisal utilizes the extraordinary assumption that the cost to cure utilized herein is substantially correct (as the appraiser is not a repair expert and industry cost manuals such as Marshall & Swift do not provide meaningful results for this level of project scope.)

2. The appraiser has not been made aware of potential litigation affecting the subject or of any active code violations or fines due. This appraisal is conducted under the extraordinary assumption that the subject property is not subject to litigation, code violations, or other fines that would affect value.

3. The appraiser was informed that the subject may be part of bankruptcy proceedings. This appraisal is conducted under the extraordinary assumption that no legal issues impact the subject's ability to transfer ownership and/or be sold in an arms-length transaction (commensurate with the definition of market value utilized herein).

4. The appraiser was not provided a well or septic report. This appraisal is conducted under the extraordinary assumption that the existing well and septic are adequate to support the existing single-family residence; but are not adequate to support additional residences; and no additional water supply is possible (as described to the appraiser by the owner).

5. Based on the information provided, this appraisal is conducted under the extraordinary assumption that no public uses or additional residences would be approved/allowed to be developed on the subject property (consistent with documentation provided).

Based on the data presented, the concluded As Is Market Value of the Leased Fee interest of the subject property, as of June 20, 2025, is:

**$620,000**

**Six Hundred Twenty Thousand Dollars**

Respectfully Submitted,

June 24, 2025

Kristen M. Magnussen
Certified General License No. AG043553
License Expiration: January 15, 2026

Magnussen Appraisal

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          3

## Table of Contents

APPRAISAL SUMMARY .................................................................................................. 4

SUBJECT PHOTOGRAPHS ............................................................................................. 5

PARCEL MAP ................................................................................................................ 13

AERIAL PHOTOGRAPH ................................................................................................. 14

SITE PLAN .................................................................................................................... 15

TOPOGRAPHIC MAP .................................................................................................... 16

FLOOD MAP ................................................................................................................. 17

REPORT SCOPE ........................................................................................................... 18

VALUATION SCOPE ...................................................................................................... 20

PROPERTY OWNERSHIP ............................................................................................... 21

PROPERTY HISTORY, CURRENT OFFERINGS AND/OR PENDING CONTRACTS ............ 21

REGIONAL MARKET DESCRIPTION & ANALYSIS .......................................................... 22

LOCAL DESCRIPTION & ANALYSIS .............................................................................. 38

PROPERTY DESCRIPTION & ANALYSIS ........................................................................ 42

ASSESSMENT AND TAX ANALYSIS .............................................................................. 44

ZONING & LAND USE ANALYSIS .................................................................................. 45

HIGHEST AND BEST USE .............................................................................................. 46

VALUATION METHODOLOGY ....................................................................................... 48

SALES COMPARISON APPROACH ................................................................................ 49

FINAL RECONCILIATION .............................................................................................. 65

VALUE CONCLUSION ................................................................................................... 65

EXPOSURE TIME ........................................................................................................... 65

CERTIFICATION STATEMENT ....................................................................................... 66

ADDENDA .................................................................................................................... 67

DEFINITIONS ................................................................................................................ 69

GENERAL ASSUMPTIONS AND LIMITING CONDITIONS .............................................. 71

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    4

# Appraisal Summary

| Summary of Salient Facts and Conclusions | |
|---|---|
| Property Type | Single Family Residence on 34.16 Acres |
| Address | 202 Monte Cristo Place |
| City | Cambria |
| State | CA |
| Zip | 93428 |
| County | San Luis Obispo |
| APN(s) | 013-181-005 |
| Site Size (Gross Acres) | 34.16 |
| Site Size (Gross SF) | 1,488,010 |
| Structural Improvements | See Subject Improvements List (Addenda) |
| Single Family Residence SF | 2,068 |
| Site Shape | Polygon |
| Topography | Gentle to Moderate |
| Frontage Improvements | Unpaved Private Street; Asphalt Paved Driveway |
| Zoning | REC (Recreation) |
| Legal Conformance | Legal, Conforming |
| Highest and Best Use as Vacant | Hold for Future Speculative Residential Development |
| Highest and Best Use as Improved | Continued Residential/Ancillary Transmission Use |
| Most Likely Buyer | Owner/User |
| Interest Appraised | Leased Fee |
| Value Condition | As Is |
| Effective Date of Value | June 20, 2025 |
| **Value Indications/Conclusions** | |
| Cost Approach | N/A |
| Sales Comparison Approach | $620,000 |
| Income Approach | N/A |
| Market Value Conclusion | **$620,000** |
| Exposure Time | 3 to 6 months |

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA        5

## Subject Photographs



Subject Abstract Taken From Driveway



View Northwest Along Driveway




Birdseye View (MLS Photo)



Single-Family Residence (MLS Photo)



Single-Family Residence – Rear



Kitchen View 1

Magnussen Appraisal

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          6





Kitchen View 2                               Kitchen View 3




Living Room                                  Bedroom Example




Bedroom Example                              Bath 1 View 1

*Three subject bedrooms were inaccessible, but are assumed in similar condition as the accessible bedrooms.*

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA      7





Bath 1 View 2                              Bath 2





Ocean View From Single-Family          Ocean View From West Portion of Site
Residence




Example of Site Ocean Views            Example of Site Mountain Views





Example of Obsolete Building                    Example of Obsolete Building





Example of Obsolete Building                    Example of Obsolete Building





Example of Obsolete Building                    Example of Obsolete Building

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA        9


Example of Obsolete Building


Example of Obsolete Building


Example of Obsolete Buildings


Example of Obsolete Building


Example of Obsolete Building

Example of Obsolete Building

Example of Obsolete Building

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          10



Example of Obsolete Building



Example of Obsolete Building



Example of Obsolete Building



Example of Obsolete Building



Example of Obsolete Building



Electric Improvements

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          11

 

Example of Outbuilding                        Water Source

 

Transmission Tower at Right          Transmission Tower & Equipment Building

 

Transmission Equipment          Transmission Equipment Building Interior

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    12

 

Transmission Equipment Building Electric
Panels

Transmission Equipment Building Electric
Panels

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          13

## Parcel Map



Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          14

## Aerial Photograph



*Parcel Lines are Approximate*

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA        15

## Site Plan



former
mbria Air Force
ation

100 operations
101 maintenance
102 power GENERATION
103 shelter
104 high tower
106 transmission
108 steel tower
109 paint 1
110 paint 2
111 central gate
116 lower tower
118 water treatment
119 pump house
124 carpenter
200 admin
201 front gate
202 officer housing
204 mess hall
206 officer club
208 barrack 1
211 central shack
212 barrack 2
214 barrack 3
218 barrack 4
220 barrack 5
225 commission store
226 PX
227 bowling alley
228 motor pool
229 communication
230 tower antenna
231 electric substation
232 subterranean
       water tanks
233 tennis court

310 Boiler Building

## Topographic Map



## Flood Map



| Special Flood Hazard Area (SFHA) | Distance to 100 yr Flood Plain | Flood Zone Code |
|---|---|---|
| Out | -1 | D |

| County | FIPS Code | Community Name |
|---|---|---|
| San Luis Obispo | 06079 | San Luis Obispo County |

| Community Participation Status | Community Number – Map Panel & Suffix | Panel Date |
|---|---|---|
| R – Regular | 060304-0539H | May, 16, 2017 |

| Original Panel Firm Date | Coastal Barrier Resource Area (CBRA) | Letter of Map Amendment (LOMA) |
|---|---|---|
| July, 5, 1982 | Out | Flood Risk Score not available for this property. |

## Report Scope

The Uniform Standards of Professional Appraisal Practice states that it is the appraiser's responsibility to determine the appropriate scope of work.  USPAP defines the scope of work as:

The amount and type of information researched and the analysis applied in an assignment.  Scope of work includes, but is not limited to, the following:

> the degree to which the property is inspected or identified;

> the extent of research into physical or economic factors that could affect the property;

> the extent of data research; and

> the type and extent of analysis applies to arrive at opinions or conclusions.

### Report format

This is an Appraisal Report as defined by Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2(a).  This format provides a summary of the appraisal process, subject and market data, and valuation analyses.

### Intended Use

Potential Listing/Sale

### Intended User

The Client and Associated Agents

### Interest Valued

Leased Fee

### Date of Value

June 20, 2025

### Property Identification

The subject property has been identified using an assessor's parcel map and physical landmarks such as streets and fences.

### Inspection

An inspection of the subject was made on June 20, 2025, and photographs were taken.

**Market Area and Analysis of Market Conditions**
An analysis of market conditions was made. This analysis is appropriate to the appraisal problem to be solved.

**Highest and Best Use Analysis**
Market conditions and relevant market data have been analyzed in the course of a complete Highest and Best Use analysis, both as vacant and as improved.

**Data Collection & Type/Extent of the Data Researched**
The appraiser searched the subject market area for similarly zoned sales comparable to the subject property. Data and verification has been obtained from some or all of the following sources:

- Costar
- Regional MLS
- Craigslist
- Loopnet
- Zillow
- Appraiser's files
- Public records
- Local brokers
- FEMA Flood Map Service
- US Bureau of Labor Statistics
- Inspection
- Aerial measurements
- Regional and/or local GIS
- Local Planning Department
- Available Economic Reports

**Typical Client Expectations**
The extent of research and reporting conducted in the course of this assignment is consistent with client expectations.

**Typical Appraisal Work by Peers**
The level of research, verification and reporting conducted during the course of this assignment is similar to work produced by other appraisers specializing in appraisals for potential listing/sale.

**Professional Assistance**
No persons outside of the signatories of this report provided significant professional appraisal assistance.

## Valuation Scope

### Regulatory Compliance

This appraisal is performed in conformance with:

1) Uniform Standards of Professional Appraisal Practice (USPAP)
2) Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA)
3) Interagency Appraisal and Evaluation Guidelines
4) Appraisal Institute Code of Professional Appraisal Practice
5) Appraisal requirements of the client

### Approaches Utilized/Omitted

The Sales Comparison Approach is utilized as there was adequate market data to reflect market behavior for properties of this type. The Income Capitalization Approach is not applicable since the most likely buyer is an owner-user and rental income potential would typically be less than 12 months. The Cost Approach is not developed given the speculative nature in estimating depreciation in properties built more than 10 years ago.

### Hypothetical Conditions

None.

### Extraordinary Assumptions

1. Due to the complexity of the remediation and demolition/removal of the subject's obsolete structures, with no professional cost estimates provided (except for asbestos remediation by Padre Associates), this appraisal utilizes the extraordinary assumption that the cost to cure utilized herein is substantially correct (as the appraiser is not a repair expert and industry cost manuals such as Marshall & Swift do not provide meaningful results for this level of project scope.)

2. The appraiser has not been made aware of potential litigation affecting the subject or of any active code violations or fines due. This appraisal is conducted under the extraordinary assumption that the subject property is not subject to litigation, code violations, or other fines that would affect value.

3. The appraiser was informed that the subject may be part of bankruptcy proceedings. This appraisal is conducted under the extraordinary assumption that no legal issues impact the subject's ability to transfer ownership and/or be sold in an arms-length transaction (commensurate with the definition of market value utilized herein).

4.  The appraiser was not provided a well or septic report. This appraisal is conducted under the extraordinary assumption that the existing well and septic are adequate to support the existing single-family residence; but are not adequate to support additional residences; and no additional water supply is possible (as described to the appraiser by the owner).

5.  Based on the information provided, this appraisal is conducted under the extraordinary assumption that no public uses or additional residences would be approved/allowed to be developed on the subject property (consistent with documentation provided).

## Property Ownership

Public Records (Realist) indicate the subject is currently vested in the ownership of BKS Cambria, LLC.

## Property History, Current Offerings and/or Pending Contracts

Public records indicate the subject has not sold or transferred within the last three years. The subject has not been listed in the last 12 months. The subject was listed April 30, 2020 (MLS#20574792) for $4,375,000 and remained on the market until December 8, 2020 when the listing was cancelled. As the appraiser has not been made aware of any offers produced by this listing, and since no sale commenced as a result, the prior listing price is not a meaningful comparison to the appraised market value.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          22

## Regional Market Description & Analysis

The subject is located in the County of San Luis Obispo, California.

### Regional Description

San Luis Obispo County, often referred to as "SLO," is considered one metropolitan region and encompasses roughly 3,300 square miles, bordering 100 miles of coastline. The County is equidistant from Los Angeles and San Francisco, constrained on the north by Monterey County, on the northeast corner by Kings County, on the east by Kern County, on the south by Santa Barbara County, and on the west by the Pacific Ocean. Fresno County and Ventura County borders are also within near proximity (although not adjacent) to the San Luis Obispo County eastern corners.

**Regional Map**



The County Seat is the City of San Luis Obispo, which is surrounded by 6 additional incorporated cities within the County - Arroyo Grande, Atascadero, Grover Beach, Morro Bay, Paso Robles, and Pismo Beach.

Main highway arterials include SR-1 and US-101 running north-south; and SR-46, SR-41 and SR-58 running east-west to I-5 (located beyond the eastern county line).  San Luis Obispo County Regional Airport, located near the City of San Luis Obispo, serves 8 direct flight destinations - Phoenix, San Francisco, Denver, Dallas, Los Angeles, Seattle, Portland and San Diego.  Additional transportation via Amtrak rail service is accommodated by a train station in downtown (City of) San Luis Obispo.

The City of Morro Bay has the only all-weather small craft commercial and recreational harbor between Santa Barbara and Monterey, and the Paso Robles Municipal Airport provides private (non-airline) aviation facilities.

The south-coastal region (including Arroyo Grande, Grover Beach and Pismo Beach) comprises the gateway to Santa Barbara County and southern California.  The north-coastal areas of Baywood-Los Osos, Morro Bay, Harmony, Cambria and San Simeon are located south of the "Gateway to Big Sur" at Ragged Point, near the northern county line. Significant tourism passes through the area, with Hearst Castle in San Simeon attracting 700,000+ visitors each year[1] totaling $16.2 million in revenue in 2019.[2]

Inland-eastern areas of the county include world-renowned Paso Robles and Edna Valley wine country regions.  The cities of Templeton and Atascadero are located along US-101 and benefit from their location in between the cities of San Luis Obispo and Paso Robles, the county's two largest cities.  Rural areas include several smaller farming communities - Shandon, Creston, Pozo, Guadalupe and San Miguel.  Lake Nacimiento, in the north-central area of the county, is the center of a residential area of roughly 1,272 households[3]. There are several other distinct smaller nodes throughout the county.

The county's geographic characteristics reflect an adequate support system for its vast amount of visitors (nearly 30 times the local population annually) and its full-time population. Other environmental, governmental, social, and economic influences are discussed on the following pages.

**Environmental Forces**
Environmental forces have an enormous impact on land use and development in the area.  During the summer months, the presence of the Pacific Ocean and the north-south running Santa Lucia Mountain range (separating up to 40-degree temperature variances) creates marine-layer fog at the coast when temperatures soar in the inland areas and supercool over the ocean.

---

[1] The Hearst Foundation
[2] Los Angeles Times
[3] Point2homes.com

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA        24

This unique climate enables cultivation of a wide variety of produce, famously grapes, the second-highest-revenue crop in the county. The Paso Robles wine region has eleven distinct viticultural areas, and approximately 33,000 vineyard acres hosting 200+ wineries (many producing wine enjoyed worldwide). Strawberries were the top crop county-wide in 2021, with avocados, broccoli and cattle representing the third- through fifth-highest-revenue crops[1]. San Luis Obispo County receives an average of 287 sunny days per year compared to the US average of 205[2] and frequently enjoys arid, mild conditions.

The county is home to 931,291 (75,000+ irrigated) acres of farm land, comprising 40.2% (3.2% irrigated) of the county's total 2.314 million acres (USDA 2017 Census of Agriculture, usda.gov). The San Luis Obispo County Department of Agriculture/Weights & Measures 2021 Crop Report indicates county-wide crop values exceeding $1 billion in 2021, a level not seen since 2018.

While nature often smiles on the area with the climate's renowned mild temperatures, high number of sunny days, and cool summers on the coast due to the marine layer, the area has historically been battered in the winter with severe and devastating "Atmospheric River" weather patterns. During rain seasons, typically in winter through early spring (except for years of drought which have occurred frequently in the past), these systems bring extreme heavy and stationary rainfall. Flash flooding, washouts, levee breaks, landslides, and rising waters which especially affect the coast and creek-proximate low-lying inland areas, have plagued the area in past years. Up to 80 mph wind gusts cause downed trees, power outages and significant property damage.

Although the region generally survived past calamities and continued to grow despite extreme weather events, future environmental challenges like climate change, flooding, wildfires, high winds, droughts, and other extreme nature-related events will always be a part of life on the Pacific Coast. Still, the positive elements of the region's climate, natural surroundings, and linkage infrastructure (along with social, governmental and economic forces discussed later) enable the area to maintain overall favorable influences from environmental forces.

**Governmental Forces**
According to BestPlaces.net, San Luis Obispo County is leaning democratic, with 55.3% voting democrat in the last presidential election, 42.2% voting republican, and the remaining 2.5% voting independent.

San Luis Obispo is within Congressional Districts 19 & 24. District 19 covers northern portions of the county from Atascadero, Cayucos and above, into parts of Santa Cruz, Monterey, and Santa Clara counties. Most of south county is in District 24 with Santa Barbara and Ventura Counties. In 2024, prominent governmental concerns include affordable housing

---

[1] Pacific Coast Business Times, August 2022
[2] Bestplaces.net

and cost of living, education, child and health care, employment sustenance, immigration reform, public infrastructure improvements, and clean water access.

Renewable energy is another prominent issue. Several planned offshore wind farms, which can take up to 15 years to develop and will place wind turbines 15 to 30 miles offshore, have been met with strong opposition.

**Social Forces**
San Luis Obispo's social forces play a major role in its growth. Thriving businesses, numerous tourism draws, the presence of California Polytechnic State University (with a record attendance of 22,400 in fall 2022), a 9-Disctrict public school system, and a linkage-rich infrastructure (among other factors) enable the region to maintain a healthy economy despite experiencing several economic threats throughout the last decade. According to the US Census Bureau, San Luis Obispo County is home to 282,424 people as of 2020, and is the 23rd-most populous county of 58 total California counties.

During the "Great Economic Expansion" pre-pandemic, an improving employment market, comparative price advantage of housing in San Luis Obispo (less than other coastal California metros), and other factors drew a steady (roughly 10%) increase in county population. However, growth constraints caused housing prices to rise drastically. Despite COVID-era factors influencing in-migration from larger cities as many workers transitioned from in-office to remote work, the area lost most of the expansion's population increase during 2021-2022, as a surge of out-migration occurred as inflation increased, the supply of affordable housing diminished, and workers moved to inland counties with more favorable employment conditions[1].

The San Luis Obispo County 2022 County-Level Economic Forecast indicates long-range population growth is anticipated to remain relatively stagnant until 2050, as it is forecast to decline slightly from 282,424 persons (2022) to 264,111 persons (2050), with ebbs and flows not exceeding 280,000 within that time frame.

Despite anticipated stagnant population growth, the area's appeal to visitors is expected to supply substantial transient population to the area, which totaled an estimated 7.5 million visitors in 2022[2]. Visit SLOCAL (the county's destination marketing and management organization) indicated that the travel industry in San Luis Obispo County is still thriving and appears to have returned to pre-pandemic levels as of second-quarter 2023.

---

[1] San Luis Obispo County 2022 County-Level Economic Forecast
[2] Visit SLO CAL

Although the county's tourism industry shows no signs of slowing down, the area is not immune to economic fluctuations, and some investors are becoming more cautious as nationwide and regional economic recessionary signals progress. Tourism Economics expects daily hotel room demand in the region to slow to 5.1% year-on-year in 2023, down from 7.5% last year and an unsustainable 32.4% surge in 2021[1]. While the area will retain its appeal to visitors as it has for decades, given the indicators, it is evident that some caution will be experienced in the market as economic conditions decline nationwide and as a result, affect travel levels on a macro- and micro-economic level.

## Economic Forces

San Luis Obispo's past resilience has been bolstered by a healthy employment market, diversified world-reaching industries, conducive infrastructure, and highly active tourism attracted by the desirable climate and activities.  However, a recent exodus of workers leaving the county has become a concern due to housing costs more than doubling since 2013[2] and continuing to rise.  The sustenance of the tourism industry largely depends on its support system and employment infrastructure.

## Employment

Employment in San Luis Obispo is fueled mainly by its trade, transportation, utilities, education/health services, and leisure/hospitality sectors. San Luis Obispo County's employment market is summarized as:

**SAN LUIS OBISPO EMPLOYMENT BY INDUSTRY IN THOUSANDS**

| Industry | CURRENT JOBS | | CURRENT GROWTH | | 10 YR HISTORICAL | | 5 YR FORECAST | |
|---|---|---|---|---|---|---|---|---|
| | Jobs | LQ | Market | US | Market | US | Market | US |
| Manufacturing | 9 | 0.9 | 0.99% | 0.41% | 2.29% | 0.62% | 1.19% | 0.33% |
| Trade, Transportation and Utilities | 20 | 0.9 | 0.43% | 0.84% | -0.32% | 1.00% | 0.20% | 0.28% |
| Retail Trade | 14 | 1.1 | 0.79% | 0.87% | -0.05% | 0.24% | 0.29% | 0.21% |
| Financial Activities | 4 | 0.6 | 2.81% | 0.39% | 0.66% | 1.47% | -0.26% | 0.35% |
| Government | 22 | 1.3 | -4.35% | 2.17% | -0.15% | 0.66% | 0.70% | 0.51% |
| Natural Resources, Mining and Construction | 9 | 1.3 | 2.25% | 2.32% | 3.50% | 2.26% | 0.46% | 0.72% |
| Education and Health Services | 19 | 1.0 | 2.53% | 3.44% | 1.77% | 2.07% | 0.55% | 0.76% |
| Professional and Business Services | 12 | 0.7 | 5.74% | 0.83% | 2.32% | 1.80% | 1.09% | 0.59% |
| Information | 1 | 0.5 | -2.99% | 0.60% | -2.19% | 1.02% | 0.44% | 0.54% |
| Leisure and Hospitality | 21 | 1.6 | 4.44% | 2.22% | 2.22% | 1.46% | 1.18% | 0.98% |
| Other Services | 4 | 0.8 | -2.39% | 1.40% | -0.02% | 0.61% | 0.85% | 0.48% |
| **Total Employment** | **121** | **1.0** | **1.13%** | **1.64%** | **1.15%** | **1.33%** | **0.71%** | **0.66%** |

Source: Oxford Economics
LQ = Location Quotient

---

[1] Bank of the West California Economic Outlook Report, Central Coast, April 2023
[2] Realtor.com

Magnussen Appraisal

Demographic trends indicate relatively stable population historical and forecast growth, with notable increases in median household income and stable household, labor, and unemployment fluctuations.

**DEMOGRAPHIC TRENDS**

| Demographic Category | Current Level | | 12 Month Change | | 10 Year Change | | 5 Year Forecast | |
|---|---|---|---|---|---|---|---|---|
| | Metro | US | Metro | US | Metro | US | Metro | US |
| Population | 280,615 | 336,859,156 | -0.3% | 0.6% | 0.1% | 0.5% | 0.3% | 0.5% |
| Households | 111,509 | 131,669,891 | -0.2% | 0.7% | 0.6% | 0.9% | 0.4% | 0.6% |
| Median Household Income | $99,632 | $78,268 | 5.8% | 2.4% | 4.8% | 3.9% | 4.5% | 3.5% |
| Labor Force | 137,293 | 168,455,266 | 0.3% | 0.5% | -0.2% | 0.8% | 0.6% | 0.4% |
| Unemployment | 3.9% | 3.9% | 0.3% | 0.2% | -0.1% | -0.2% | - | - |

Source: Oxford Economics

**POPULATION GROWTH**



**LABOR FORCE GROWTH**



**INCOME GROWTH**



Source: Oxford Economics

## Retail Trends

San Luis Obispo's retail market suffered during the pandemic, but has rebounded to strong levels with low vacancy and positive rent growth. Single-tenant availability has been relatively stable over the past several years, hovering near 3.5% in the fourth quarter of 2024. Approximately 170,000 SF are under construction and roughly 30,000 SF of that space is available for lease. New labor law raising wages for fast food workers and a softer-than-expected consumption environment could disrupt the market to the downside, however. Coupled with persistent inflation, operating and labor expenses could approach untenable levels for smaller tenants, impacting business formation.

**San Luis Obispo Retail**

| 12 Mo Deliveries in SF | 12 Mo Net Absorption in SF | Vacancy Rate | Market Asking Rent Growth |
|---|---|---|---|
| **37.6K** | **466** | **3.0%** | **2.5%** |

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    28

**KEY INDICATORS**

| Current Quarter | RBA | Vacancy Rate | Market Asking Rent | Availability Rate | Net Absorption SF | Deliveries SF | Under Construction |
|---|---|---|---|---|---|---|---|
| Malls | 0 | - | - | - | 0 | 0 | 0 |
| Power Center | 1,689,507 | 6.1% | $36.06 | 7.7% | 3,227 | 0 | 0 |
| Neighborhood Center | 3,951,595 | 5.6% | $26.51 | 7.7% | 0 | 0 | 0 |
| Strip Center | 719,622 | 2.6% | $25.56 | 5.2% | 0 | 0 | 30,789 |
| General Retail | 9,164,373 | 1.3% | $27.54 | 1.9% | (7,236) | 0 | 138,745 |
| Other | 147,603 | 0% | $20.40 | 0% | 0 | 0 | 0 |
| Market | 15,692,700 | 3.0% | $28.04 | 4.1% | (4,009) | 0 | 169,534 |

| Annual Trends | 12 Month | Historical Average | Forecast Average | Peak | When | Trough | When |
|---|---|---|---|---|---|---|---|
| Vacancy | 0.2% (YOY) | 3.4% | 3.2% | 4.3% | 2011 Q2 | 2.1% | 2007 Q4 |
| Net Absorption SF | 466 | 78,892 | 42,654 | 395,173 | 2012 Q2 | (110,431) | 2018 Q2 |
| Deliveries SF | 37.6K | 92,818 | 63,373 | 312,683 | 2012 Q2 | 4,620 | 2024 Q2 |
| Market Asking Rent Growth | 2.5% | 0.9% | 1.5% | 4.7% | 2023 Q3 | -6.7% | 2009 Q4 |
| Sales Volume | $59.3M | $84.2M | N/A | $151.1M | 2016 Q3 | $14.3M | 2010 Q3 |

Vacancy, net absorption and deliveries fluctuated during the pandemic recovery years, but are forecast to stabilize as shown in the chart below. Market rent has steadily increased over the last 5 years and is forecast to continue to increase.





Construction was impacted by supply chain shortages experienced during the pandemic, but is forecast to spike in 2025 before cooling off then stabilizing.



Sales volume peaked above $80 million in mid-2022, and only two quarters since then have exceeded $20 million in volume. Private investors own two-thirds of the market share in San Luis Obispo County, with 15% owned by institutional and REIT entities. The average property size sold in the past year has been under 6,000 SF with cap rates between 5.5% and 7%, but are forecast to increase as shown in the chart on the following page.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          30



## Retail Market Conclusion

As the retail market continues to experience an ever-changing landscape, San Luis Obispo has weathered market challenges well with low vacancy and steady to increasing lease rates. The area's strong potential for tourism, student and retired population, and diversified industries providing income to full-time residents lends way to a relatively optimistic outlook in the countywide retail market.

Magnussen Appraisal

## Office Trends

The San Luis Obispo office market is strong, with a relatively low vacancy rate of 3.6% as of the fourth quarter of 2024. This time last year, the market had a vacancy rate of 3.9%. This change was the result of no net delivered space and 34,000 of net absorption over the past year. Although slightly higher than the five-year average of 3.2%, vacancy is still below the majority of the region and state.

| | | | San Luis Obispo Office |
|---|---|---|---|
| 12 Mo Deliveries in SF | 12 Mo Net Absorption in SF | Vacancy Rate | Market Asking Rent Growth |
| **0** | **34.1K** | **3.6%** | **2.9%** |

The county's office market has 260,000 SF available (3.9%). As of 4Q 2024, no office space under construction in San Luis Obispo. In comparison, the market has averaged 15,000 SF of under construction inventory over the past 10 years. The office market contains roughly 6.7 million SF of inventory. The market has approximately 36,000 SF of 4 & 5 Star inventory, 2.5 million SF of 3 Star inventory, and 4.2 million SF of 1 & 2 Star inventory.

### KEY INDICATORS

| Current Quarter | RBA | Vacancy Rate | Market Asking Rent | Availability Rate | Net Absorption SF | Deliveries SF | Under Construction |
|---|---|---|---|---|---|---|---|
| 4 & 5 Star | 36,039 | 37.9% | $34 | 37.9% | 0 | 0 | 0 |
| 3 Star | 2,507,904 | 5.5% | $31.15 | 5.8% | 8,151 | 0 | 0 |
| 1 & 2 Star | 4,172,504 | 2.1% | $28.48 | 2.5% | (3,156) | 0 | 0 |
| Market | 6,716,447 | 3.6% | $29.51 | 3.9% | 4,995 | 0 | 0 |

| Annual Trends | 12 Month | Historical Average | Forecast Average | Peak | When | Trough | When |
|---|---|---|---|---|---|---|---|
| Vacancy | -0.5% (YOY) | 3.6% | 3.6% | 6.8% | 2008 Q1 | 1.5% | 2017 Q1 |
| Net Absorption SF | 34.1K | 54,839 | (2,455) | 210,057 | 2016 Q1 | (95,013) | 2021 Q1 |
| Deliveries SF | 0 | 51,428 | 0 | 157,482 | 2018 Q1 | 0 | 2024 Q3 |
| Market Asking Rent Growth | 2.9% | 0.8% | 2.3% | 12.3% | 2016 Q1 | -13.3% | 2010 Q2 |
| Sales Volume | $28.7M | $29M | N/A | $70.3M | 2023 Q3 | $5.2M | 2009 Q1 |

### NET ABSORPTION, NET DELIVERIES & VACANCY



Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          32

After a disruption during the pandemic, the office market has recovered with increasing market rents since 2022, with forecast increasing rents through 2028. However, volume has slowed and price/SF declined slightly. Cap rates have increased since 2022 but are forecast to fall.





Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA        33



**Office Market Conclusion**

While the San Luis Obispo County office market softened during the pandemic, recovery has occurred and many investor buyers in the office market retain a positive outlook given scarcity of available office space with relatively nominal vacancy.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          34

## Residential Trends

The regional residential market softened during 2023's rising interest rates. However, prices have increased in most micro-markets and volume has remained relatively stable. CoStar reports that rents have increased 2.8% year over year as of the first quarter of 2025, exceeding the national benchmark of 1.1%. Vacancy increased in mid-2023 but lowered in 2024 with a stable trend forecast over the next couple of years.

**San Luis Obispo Multi-Family**

| 12 Mo Delivered Units | 12 Mo Absorption Units | Vacancy Rate | 12 Mo Asking Rent Growth |
|---|---|---|---|
| 10 | 101 | 7.0% | 2.8% |

| Current Quarter | Units | Vacancy Rate | Asking Rent | Effective Rent | Absorption Units | Delivered Units | Under Constr Units |
|---|---|---|---|---|---|---|---|
| 4 & 5 Star | 1,426 | 15.1% | $2,772 | $2,769 | (3) | 0 | 0 |
| 3 Star | 3,381 | 6.3% | $2,110 | $2,092 | 4 | 0 | 36 |
| 1 & 2 Star | 3,497 | 4.5% | $1,783 | $1,757 | 3 | 0 | 0 |
| Market | 8,304 | 7.0% | $2,202 | $2,189 | 4 | 0 | 36 |

| Annual Trends | 12 Month | Historical Average | Forecast Average | Peak | When | Trough | When |
|---|---|---|---|---|---|---|---|
| Vacancy | -1.1% (YOY) | 3.8% | 7.1% | 9.0% | 2023 Q3 | 1.9% | 2000 Q4 |
| Absorption Units | 101 | 59 | 36 | 394 | 2021 Q3 | (118) | 2019 Q2 |
| Delivered Units | 10 | 82 | 31 | 547 | 2022 Q2 | 0 | 2017 Q3 |
| Demolished Units | 0 | 3 | 2 | 75 | 2019 Q4 | 0 | 2024 Q4 |
| Asking Rent Growth | 2.8% | 2.5% | 3.3% | 11.6% | 2022 Q2 | -5.6% | 2009 Q4 |
| Effective Rent Growth | 3.2% | 2.5% | 3.3% | 11.6% | 2022 Q2 | -5.7% | 2009 Q4 |
| Sales Volume | $70M | $31.7M | N/A | $113.6M | 2022 Q3 | $825K | 2011 Q2 |



Absorption    Net Deliveries    Vacancy    United States Vacancy

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA      35



As shown above, market rents have increased for all bedroom counts since 2019 but have been more volatile post-pandemic. Deliveries are forecast to remain very low throughout the next few years, which will put upward pressure on rents.



Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    36



Multifamily sales volume recently increased after two years of tepid conditions, with increases forecast into the near future. However, many investors remain cautious as some predict potential recessionary conditions with the implementation of import tariffs placed in early 2025.



Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          37

**Regional Market Analysis Conclusion**

The are four distinct phases in the Real Estate Market Cycle: Recovery, Expansion, Hyper-Supply, and Recession. Given low vacancies and scant new construction, the San Luis Obispo County retail, residential, and office market appears to be in the recovery or early expansion phase. The region's resilience from dullened economic conditions during the pandemic was bolstered by a healthy employment market and geographical attributes. Overall, the office/retail investment outlook in the San Luis Obispo market is generally positive, with investors remaining optimistic about forecast trends over the long term. However, some remain cautious given some recent recessionary signals and continued inflation.

## Local Description & Analysis

Cambria is a Census Designated Place (CDP) located in northwestern San Luis Obispo County, bordered by the Pacific Ocean to the west, the CDP of San Simeon to the north, the Santa Lucia Mountain Range to the east, and the CDP of Harmony to the south.

The area's downtown district comprises two distinct areas known as East Village and West Village.  Additional commercial operations – consisting of mostly hotels and restaurants - are located on Moonstone Beach Drive, adjacent to the Pacific Ocean.  There are six distinct residential neighborhoods, known as Lodge Hill, Marine Terrace, Park Hill, Pine Knolls (also known as Cambria Pines), Happy Hill, and Leimert Estates.

The area is home to one of only three native Monterey Pine forests, and the popular Fiscalini Ranch Preserve consisting of 430 acres of preserved land and trails for residents and visitors to enjoy.  Other prominent natural features (aside from the ocean) include Santa Rosa Creek, Strawberry Canyon Preserve, Moonstone Beach, and many hiking and biking trails. Camp Ocean Pines is located at the southern end of Cambria, and hosts summer camps, conferences, and a yearly Harvest Festival.

## Local Area Map



Cambria is a bedroom community and is relatively remote. Linkage to other areas of the county is provided via State Highway 1 (running north and south to Morro Bay and San Luis Obispo); and Highway 46 (running east-west to Paso Robles). The town has one K-5 elementary school, one 6-8 middle school, one 9-12 high school and one alternative high school.

The town has generally adequate infrastructure including sufficient paved primary and tertiary roadways, a community volunteer bus service, and bike lanes. The centrally located Vet's Hall facility hosts pickleball courts, a weekly farmer's market and numerous other events. Shamel Park is located near the ocean and includes a public soccer field and seasonal outdoor swimming pool. Public facilities include a post office and fire station. Although there are a few medical offices in town, medical care in Cambria is sometimes difficult to acquire, with many residents driving to other larger communities such as Paso Robles or San Luis Obispo for their health needs.

As of 2020, the US Census Bureau reports that Cambria is comprised of an area of 8.5 square miles and a population of 5,555 persons, down roughly 10.8% from 6,229 persons in 2011. With Hearst Castle located north of town (attracting 700,000+ visitors per year), and the presence of Highway 1 providing arterial access to the Big Sur region to the north, the transient population visiting the area more than compensates for the 679-person population decline during this time.

In addition to year-round draws, there are several festivals and events drawing tourists to the area. The Scarecrow Festival takes place each October and features hundreds of imaginative scarecrow exhibits. The Cambria Film Festival began its annual event in 2017, and in February 2024 featured over 70 short and full-length films from over 3,000 applicants across the globe. The Cambria Art & Wine Festival takes place every January. In December, Cambria Pines Lodge hosts the Cambria Christmas Market featuring outdoor vendors and an impressive multi-acre display of over 2 million Christmas lights, attracting an estimated 600,000+ visitors each December[1].

**Considerations Regarding Cambria's Water Supply**
Cambria's water supply (from six wells tapped into San Simeon and Santa Rosa creeks) is vulnerable to shortages due to unstable water levels, droughts, and State Water Project allocations. Even after wet winters, excess water that the aquifer is unable to hold is released to the ocean, and cannot be captured without additional state-granted permits and enhanced treatment plant infrastructure.

In 1986, a water wait list (where property owners could register their parcel for future water service) began, but was closed in 1990 after approximately 700 properties were added to the list (leaving over 5,000 undeveloped parcels off the list)[2]. In 2001, the

[1] San Luis Obispo Tribune
[2] California Polytechnic State University's "Cambria's Water War: Legal Analysis of the Building Moratorium and Its Implications for Land Owners" article

Cambria Community Services District (CCSD) declared a building moratorium restricting further new development until further notice, and has been in place ever since.  In the past, if an undeveloped lot had an existing water meter (or if one was transferred from another parcel), development could occur, however, in 2022, a landowner in Cambria with an existing water meter applied to construct a Single-Family Residence and although the owner was given preliminary green lights from the County, the California Coastal Commission (which overrides local approvals) denied the request.  Further, they stated that due to the water shortage issue, no development can take place in Cambria until further notice[1].

Cambria has a Water Master Plan (WMP) adopted in 2008.  In 2013, a Water Supply Alternatives Technical Memorandum was issued, and a study indicated that an indirect potable reuse project using brackish water was the most ideal solution.  A severe drought and emergency water shortage declaration was issued, which prompted CCSD to complete its Emergency Water Supply (EWS) project in 2014.  This project included plans for reusing as much of the existing CCSD infrastructure as possible, with much needed improvements remaining confined to the original location.  The EWS project's design, permitting and construction happened within a relatively short time (~6 months) and went into operation in January 2015.

To date, water resources management in Cambria is a significant point of contention in the community, with many concerns (aside from lack of water) about damaging the delicate ecosystem and burdening ratepayers.  In May 2022, water and sewer rates increased despite great opposition.  Some renewed hope has recently been experienced with a new CCSD General Manager being hired in May 2023, but the current water situation remains dire and unsolved.

If water usage constraints can be resolved, Cambria has approximately 50 acres of vacant and partially developed land in the Residential Multi-family and Commercial Retail categories, with the potential for 616 additional dwelling units within these land use categories[2]. However, if the building moratorium is lifted, the pace at which development of the ~700 lots on the waitlist will occur is unknown.  In April 2023, an affordable housing project was approved in Cambria using funding from public grants.  This would add a 32-unit apartment building in Cambria, the first new housing since the 2001 building moratorium went into effect, but the project is stalled due to opposition.

While many buyers are wary of Cambria's water issues, demand still exists in the area for already-improved properties. Lot sales also occur despite development constraints, indicating that some buyers are willing to purchase vacant land on a speculative basis.

---

[1] San Luis Obispo Tribune
[2] California Polytechnic State University's "Cambria's Water War: Legal Analysis of the Building Moratorium and Its Implications for Land Owners" article

Magnussen Appraisal

While some remain hopeful that the issues will be resolved eventually, a solution does not appear to be anticipated in the near future.

Cambria's appeal to visitors brings substantial transient population to the area to support the retail and hospitality sectors of the market. Although the pandemic disrupted this dynamic with closures and/or reductions in hours or services in many of the area's retail and tourism-related establishments (most notably Hearst Castle), the region (including Cambria) has mostly recovered from this.

## Local Residential Market Conditions
According to the MLS, as of the date of value, there are 44 active listings of single-family homes in Cambria, ranging from $699,000 to $8,250,000. There are an additional 9 pending/under contract listings showing healthy activity in the market. In the last 12 months, there were 136 sold single-family residences ranging from $420,000 to $17,200,000, with increasing trends seen over the last 24 months according to Realist/Corelogic and prices obtained from CRMLS.

Construction is essentially halted in Cambria due to the aforementioned building moratorium, but existing properties with water meters can be redeveloped with proper approvals. However, a 33-unit affordable housing development known as "Cambria Pines" is planned for development to be available to residents making 60% or less than the area median income. Historical demand for existing properties in Cambria consistently exceeds supply, with limited inventory fueled by the moratorium. Given the area's appeal to many, the rental market is also strong, with consistently increasing market rents and continued demand for short-, mid-, and long-term rentals.

## Local Residential Market Conclusion
Cambria's residential market is competitive and above national averages, but fairly typical of coastal California and Central Coast cities. Although some remain cautious of a pending recession, the area has weathered previous recessions relatively well. Given strong draws to the area, the subject's local residential market outlook appears positive.

## Property Description & Analysis

| Site Summary | |
|---|---|
| Number of Parcels | 1 |
| Site acres (gross) | 34.16 |
| Site SF (gross) | 1,488,010 |
| Shape | Polygon |
| Topography | Gentle to Moderate |
| Grade | At or Above Street Grade |
| Lot Orientation | Typical |
| Drainage | Appears Adequate |
| View | Excellent Ocean |
| Gas | Private Propane |
| Water | Private Well |
| Electricity | Public |
| Sewer | Private Septic |
| Easements | None Known |
| Encroachments | None Known |
| Frontage Imps | Unpaved Private Street; Asphalt Paved Driveway |
| External Influences | Beneficial Ocean Proximity |
| Hazardous Substances | Present |
| Flood Map Number | 060304-0539H |
| Flood Map Date | 5/16/2017 |
| Flood Zone | D |
| Location Rating | Good |
| Accessory Structures | See Subject Improvements List (Addenda) |
| Combining Designations | Coastal Zone; Sensitive Resource Area |
| Parking Spaces | Open |
| Parking Type | On-Site |
| Overall Access Rating | Average |
| Daily Traffic | Nominal |
| Soils/Envornmental | No atypical soil or environmental conditions are known, other than those explicitly discussed. See General Assumptions and Limiting Conditions. |
| Additional Comments | The subject site does not have external or economic obsolescence. However, functional obsolescence exists as there are obsolete buildings and other site elements associated with a former government facility needing remediation and removal. This affects marketability, and a cost to cure is deducted from the "as repaired" value to reach the "as is" value. |

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    43

| SFR Improvements Summary | |
|---|---|
| Residential Building Type | Single-Family Residence |
| Number of Stories | 1 |
| Basement | None |
| Gross Living Area | 2,068 |
| Year Built | 1958 |
| Actual Age | 67 |
| Effective Age | 30 |
| Total Economic Life | 60 |
| Remaining Economic Life | 30 |
| Foundation | Crawl Space |
| Frame | Wood Frame |
| Exterior Walls | Siding |
| Windows | Mix of Fixed and Sliders |
| Roof | Composite Shingle |
| Floors | Mix of Wood, Carpet, Tile |
| Interior Walls | Drywall |
| Beds/Baths | 5/2.0 |
| Ceiling Height | 8 to 9 feet |
| Heating | Forced Air |
| Air Conditioning | None |
| Plumbing | Appears Adequate |
| Electric Meters | Appears Adequate |
| Electric Panels | Master Meter |
| Water Heaters | Appears Adequate |
| Amenities | See Subject Improvements List (Addenda) |
| Overall Condition | Average    (As repaired) |
| Overall Quality | Average |
| Functional Obsolescence | Obsolete Buildings Needing Removal |
| Deferred Maintenance | Yes |
| Estimated Cost to Cure | $3,050,000 |
| Additional Comments | The subject has obsolete buildings and other site improvements that were part of former government operations. Several of the buildings contain asbestos needing remediation prior to removal. There are other items needing remediation (see Cost to Cure Analysis). The estimated cost to cure items of deferred maintenance is $3,050,000 which is deducted from the "as repaired" value to reach the "as is" value. |

## Assessment and Tax Analysis

The subject's property taxes are summarized as follows:

| Assessment & Taxes | |
|---|---|
| Tax Year | 2024/2025 |
| Assessed Land | $2,596,506 |
| Assessed Imps | $136,646 |
| Total Assessed | $2,733,152 |
| Ad Valorem Tax Rate | 1.000000% |
| Ad Valorem Taxes | $27,332 |
| Fixed Charges | $1,548 |
| Special Assessments | $0 |
| Total Real Estate Taxes | $28,880 |
| Effective Tax Rate | 1.056638% |
| Proforma Tax (Prop 13) | $6,551 |

### Tax Analysis

The subject's actual taxes reflect capped historical assessments due to Proposition 13. Therefore, the current taxes are not an accurate depiction of the estimated taxes once the property is reassessed after a market sale which is the premise of the appraised value.

### Note Regarding California Proposition 13

State of California Proposition 13 was implemented in 1978, which provides that the maximum amount of any real property tax shall not exceed 1% of the full cash value of such property, plus any interest and redemption charges on any indebtedness approved by the voters. Under Proposition 13, real property is reappraised only upon a change of ownership, typically at or near the sale price, or if there is new construction. Except for these two instances, the assessed valuation cannot be increased by more than a 2% inflation factor annually. Because of these limitations, there is not necessarily a correlation between the assessed value and current market value.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          45

## Zoning & Land Use Analysis

The subject is zoned REC (Recreation) in the San Luis Obispo County zoning ordinance. This designation permits development of hold for future speculative residential uses, but current new development is not legally permissible due to moratorium.

**Zoning Map**



### Subject Legal Conformance

The appraiser analyzed the subject's published zoning requirements, but a finalized determination of compliance is outside of the scope of work of this appraisal. However, it appears the subject is operating an allowed use, and is a legal, conforming use as a single-family residence with ancillary communications facilities. Although the obsolete structures are non-conforming, as a cost-to-cure is applied to the "as-repaired" value, the As Is value reported herein reflects the subject's legal, conforming use.

### Non-Conforming Structure Rebuild Policy

If the subject is found to have a non-conforming use status, the San Luis Obispo County zoning ordinance states that non-conforming uses may continue if the use is not abandoned or destroyed. Nonconforming structures destroyed less than 75% may be replaced or reconstructed under published parameters. Nonconforming structures destroyed greater than 75% must be rebuilt to code.

Magnussen Appraisal

## Highest and Best Use

Highest and Best Use is defined as[1]:

The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria that test Highest and Best Use are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

> Legal Permissibility – The property use must be either currently allowed or most probably allowable under zoning codes, building codes, environmental regulations, and other applicable laws and regulations that govern land use.

> Physical Possibility – The property use must be possible given the size, shape and soil conditions of the site, or, if improved, the physical restrictions associated with conversion to another use.

> Financial Feasibility – The property use must produce a positive return to the land (and improvements) after considering the risk and all costs to create and/or maintain the use.

> Maximum Productivity – Among legally permissible, physically possible, and financially feasible uses, the use must result in the highest net present value.

### Highest and Best Use as Vacant

Highest and Best Use as Vacant is the use that, among all reasonable alternative uses, yields the highest present land value, after payments are made for labor, capital, and coordination (entrepreneurial incentive).

The Highest and Best Use as Vacant is the use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements.

#### Legally Permissible
The subject property is zoned REC (Recreation) in the San Luis Obispo County zoning ordinance, which allows for the subject's current use. However due to the building moratorium in place, holding for future speculative residential development is the legally permissible use as-if vacant.

#### Physically Possible
The subject property is located on moderate/gentle terrain with adequate frontage/access. All utilities are available. Holding for hold for future speculative residential development is the physically possible use of the site as-if vacant.

---

[1] Appraisal Institute Dictionary of Real Estate, 7th Edition

**Financially Feasible**
As discussed in the Regional and Market Analysis section of this report, Cambria's residential market is increasing. Based on current market conditions, it is financially feasible to hold for future speculative residential development.

**Maximally Productive**
Considering the subject's allowed uses, no alternative uses of the subject would produce a higher return to the land than the existing use. Therefore, the maximally productive use of the site as vacant is to hold for hold for future speculative residential development.

**Highest and Best Use as Vacant Conclusion**
Holding for hold for future speculative residential development is the legally permissible, physically possible, financially feasible, and maximally productive use of the subject site as-if vacant. The Highest and Best Use of the subject property as vacant is to hold for future speculative residential development.

## Highest and Best Use As Improved
The subject property is improved with a single-family residence and accessory outbuildings that contribute value to site. Although some deferred maintenance is present, the Highest and Best Use As Improved is continued residential use and demolition/removal of the obsolete improvements.

## Highest and Best Use as Improved Conclusion
The Highest and Best Use as Improved is continued residential/ancillary transmission use with demolition/removal of the obsolete improvements.

## Most Likely Buyer
The comparables utilized in the Sales Comparison Approach reflect owner/user buyers. Considering constraints on the development potential of the subject in a market with a building moratorium and other legal constraints for new development, an owner/user is the most likely buyer for the subject property.

## Valuation Methodology

In appraisal, three conventional methods are used to value real estate: the Cost Approach, the Sales Comparison Approach, and the Income Approach.

The Cost Approach derives a land value "as-if" vacant and adds the replacement cost (depreciated) of the improvements to derive a value. Due to the speculative nature of estimating depreciation in structural improvements constructed more than 10 years ago, the Cost Approach is not applicable or conducted.

The Sales Comparison Approach compares similar properties that have recently sold or are currently offered for sale with the subject. The reliability of this approach depends on the comparability of the market data used, the time frame in which the comparable sales occurred, and any unusual conditions affecting the sales price. Adjustments are then made for pertinent differences such as location, size, zoning, utility, entitlements and condition/improvements. This approach is considered to be a reliable indicator of market value for the subject property as there was adequate market data to reflect market behavior for properties of this type.

The Income Approach uses actual or market rent and a market-derived capitalization rate to derive a value via direct capitalization or discounted cash flow. This approach is typically used by investors purchasing income property. This approach is not relevant to the valuation given the subject's appeal to owner-users as a single-family property.

The Income and Cost Approaches are not applicable and are not developed. The sales comparison approach is applicable and utilized as there was adequate data available to reflect market behavior for properties of this type.

The Final Reconciliation section of this appraisal then weighs each applicable approach to value, considering the strength of reliability of each approach. The discussion culminates in a Final Opinion of Value derived from the weighting of the various strengths/weaknesses of each approach.

## Sales Comparison Approach

The market was researched to find recently sold comparable properties. The sample set was narrowed down to five closed sales comparables and one active listing that represent the most direct comparison to the subject, as outlined on the following pages followed by a location map and analysis grid. The information for each comparable sale was verified via available sources, including but not limited to public records, CoStar, MLS, and other methods available to the appraiser for data verification.

A supported quantitative analysis and Sales Comparison Grid outlines various adjustments made to the comparables, and the reasoning for the selection of adjustment amounts. The Sales Comparison Approach conclusion is then considered in the Final Reconciliation of Value section of this report.

## Summary of Comparable Market Data

The following pages outline the comparable sales selected and pertinent information found through various sources described. In order to develop the subject's As Is Value, the following sales comparables were researched and analyzed.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    50

---



| Comparable Sale 1 | | | | |
|---|---|---|---|---|
| **Comparable Identification** | | **Site Description** | | |
| Address | 900 Pineridge Dr | Site Size (Acres) | 15.32 | |
| City | Cambria | Site Size (SF) | 667,339 | |
| State | CA | Utilities | Typical | |
| Zip | 93428 | Location | Cambria | |
| **Sale Details** | | Zoning | RL | |
| Status | Sold | Amenities | 2nd Txfrable Water Meter | |
| Sale Date | May-25 | Condition | Developed | |
| Sale Price | $2,700,000 | Shape | Irregular | |
| Sale Price/Acre | $176,240 | View | V.Good Ocean | |
| Doc. No. | 13686 | Improvements | 3,729 sf 2br 2.2ba SFR; 3-car garage | |
| Property Rights | Fee Simple | Improvements Condition | Average | |
| Financing | Private | Access | Good | |
| Conditions of Sale | None | Site Utility | Fair | |

**NOTES**

This property is adjacent to a nature preserve and has elevated panoramic ocean views. Site utility is fair due to steep, wooded terrain. A second transferable water meter was included in sale, which has some value limited by a building moratorium has in place for more than 20 years.

**VERIFICATION SOURCES**

MLS#SC24153839, Realist; * Photo displayed obtained from MLS*

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    51



### Comparable Sale 2

| Comparable Identification | | Site Description | |
|---|---|---|---|
| Address | 6115 Santa Rosa Creek Rd | Site Size (Acres) | 31.82 |
| City | Cambria | Site Size (SF) | 1,386,079 |
| State | CA | Utilities | Typical |
| Zip | 93428 | Location | Cambria |
| **Sale Details** | | Zoning | AG |
| Status | Sold | Amenities | Pond;Barn;Citrus/AvoGrove;OwnedSolar;1br2ba guesthouse |
| Sale Date | Apr-25 | Condition | Developed |
| Sale Price | $2,600,000 | Shape | Irregular |
| Sale Price/Acre | $81,710 | View | Mountain |
| Doc. No. | 8961 | Improvements | 2,536 sf 3br1.1ba SFR; 3-car garage |
| Property Rights | Fee Simple | Improvements Condition | Average |
| Financing | Conventional | Access | Good |
| Conditions of Sale | None | Site Utility | Average |

**NOTES**

This property has a 450 GPM well with 20k gallon water storage. Existing fruit/avo trees are advertised as income-producing.

**VERIFICATION SOURCES**

MLS#SC24113105, Realist; * Photo displayed obtained from MLS*

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          52

| Comparable Sale 3 |
|---|



| Comparable Identification | | Site Description | |
|---|---|---|---|
| Address | 4025 Highway 1 | Site Size (Acres) | 566.78 |
| City | Cayucos | Site Size (SF) | 24,688,937 |
| State | CA | Utilities | Typical |
| Zip | 93430 | Location | Cayucos |
| **Sale Details** | | Zoning | AG |
| Status | Sold | Amenities | Agriculture Buildings;Pond;Mobile Home;Corrals;Water Storage |
| Sale Date | Aug-24 | Condition | Developed |
| Sale Price | $5,000,000 | Shape | Irregular |
| Sale Price/Acre | $8,822 | View | Excellent Ocean |
| Doc. No. | 21608 | Improvements | 3,690 sf ranch dwellings |
| Property Rights | Fee Simple | Improvements Condition | Good |
| Financing | Cash | Access | Good |
| Conditions of Sale | None | Site Utility | V.Good |

**NOTES**

This property is in the Williamson Act and include 3 parcels, five wells, and over 100,000 gal of water storage, a pond, a few ranch dwellings and numerous AG buildings (workshops, barns, canopies).

**VERIFICATION SOURCES**

MLS#NS24080300

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    53



| **Comparable Sale 4** | | | |
|---|---|---|---|
| **Comparable Identification** | | **Site Description** | |
| Address | 4980 Cabrillo Ave | Site Size (Acres) | 111.00 |
| City | Cayucos | Site Size (SF) | 4,835,160 |
| State | CA | Utilities | Typical |
| Zip | 93430 | Location | Cayucos |
| **Sale Details** | | Zoning | AG |
| Status | Sold | Amenities | None |
| Sale Date | Jan-24 | Condition | Raw |
| Sale Price | $2,100,000 | Shape | Irregular |
| Sale Price/Acre | $18,919 | View | Good Ocean |
| Doc. No. | 1242 | Improvements | Approved Plans |
| Property Rights | Fee Simple | Improvements Condition | Vacant Land |
| Financing | Cash | Access | Adequate |
| Conditions of Sale | None | Site Utility | Fair |

**NOTES**
This property has approved building plans and has 1,000' of coastal frontage. Access is available via easement.

**VERIFICATION SOURCES**
MLS#SC23060510; Realist; * Photo displayed obtained from MLS*

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          54



### Comparable Sale 5

| Comparable Identification | | Site Description | |
|---|---|---|---|
| Address | 9955 Green Valley Rd | Site Size (Acres) | 47.84 |
| City | Cambria | Site Size (SF) | 2,083,910 |
| State | CA | Utilities | Typical |
| Zip | 93428 | Location | Cambria |
| **Sale Details** | | Zoning | RL |
| Status | Sold | Amenities | Owned Solar; Outdoor Kitchen |
| Sale Date | May-23 | Condition | Developed |
| Sale Price | $2,800,000 | Shape | Irregular |
| Sale Price/Acre | $58,528 | View | Good Ocean |
| Doc. No. | 14664 | Improvements | 2,790 sf 3br 2.1ba SFR; 3-car garage |
| Property Rights | Fee Simple | Improvements Condition | Good |
| Financing | Conventional | Access | Good |
| Conditions of Sale | None | Site Utility | Average |

**NOTES**
This property has panoramic views and is adjacent to a land conservancy.

**VERIFICATION SOURCES**
MLS#NS22201739; Realist; * Photo displayed obtained from MLS*

### Comparable Sale 6



| Comparable Identification | | Site Description | |
|---|---|---|---|
| Address | 7515 Santa Rosa Creek Rd | Site Size (Acres) | 195.00 |
| City | Cambria | Site Size (SF) | 8,494,200 |
| State | CA | Utilities | Typical |
| Zip | 93428 | Location | Cambria |
| **Sale Details** | | Zoning | AG |
| Status | Active | Amenities | Creek;2Barns;Outbldg;Avo Trees;OwnedSolar |
| Sale Date | Active | Condition | Developed |
| Sale Price | $3,985,000 | Shape | Irregular |
| Sale Price/Acre | $20,436 | View | GoodVineyard/Ocean |
| Doc. No. | 107-265 | Improvements | 1,614 sf 2ba1ba SFR; 3-car garages |
| Property Rights | Fee Simple | Improvements Condition | Average |
| Financing | Conventional | Access | Good |
| Conditions of Sale | None | Site Utility | V.Good |

**NOTES**

The property has been listed for 347 days. The site is in the Williamson Act and has 1,000 Avocado trees with 50k gal water storage and multiple springs.

**VERIFICATION SOURCES**

MLS#SC24098805; Realist; * Photo displayed obtained from MLS*

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          56

## Sales Comparables Map



Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    57

## Sales Comparison Analysis Grid

| | SUBJECT | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 |
|---|---|---|---|---|---|---|---|
| Address | 202 Monte Cristo Place | 900 Flintridge Dr | 6115 Santa Rosa Creek Rd | 4025 Highway 1 | 4980 Cadriz Ave | 9855 Green Valley Rd | 7515 Santa Rosa Creek Rd |
| City | Cambria | Cambria | Cambria | Cayucos | Cayucos | Cambria | Cambria |
| State | CA | CA | CA | CA | CA | CA | CA |
| Sale Price | Appraised | $2,700,000 | $2,600,000 | $5,000,000 | $2,100,000 | $2,800,000 | $3,985,000 |
| Sale Price/Land Acre | Appraised | $176,240 | $81,710 | $8,822 | $18,919 | $68,528 | $20,436 |
| Sale Date | Jun-25 | May-25 | Apr-25 | Aug-24 | Jan-24 | May-23 | Active |
| Annual Market Change | Increasing | 0% | 1% | 3% | 7% | 9% | -10% |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Adjustment | | 0% | 0% | 0% | 0% | 0% | 0% |
| Financing | Conventional | Private | Conventional | Cash | Cash | Conventional | Conventional |
| Adjustment | | 0% | 0% | 0% | 0% | 0% | 0% |
| Conditions of Sale | None | None | None | None | None | None | None |
| Adjustment | | 0% | 0% | 0% | 0% | 0% | 0% |
| Adjustments % | (Cumulative) | 0% | 1% | 3% | 7% | 9% | -10% |
| Adjustments $ | (Cumulative) | $0 | $26,000 | $150,000 | $147,000 | $252,000 | -$398,500 |
| Adjusted Price | Appraised | $2,700,000 | $2,626,000 | $5,150,000 | $2,247,000 | $3,052,000 | $3,586,500 |
| Location | Cambria | Cambria | Cambria | Cayucos | Cayucos | Cambria | Cambria |
| Adjustment | | 0% | 0% | 0% | 0% | 0% | 0% |
| Acres | 34.16 | 15.32 | 31.82 | 566.78 | 111.00 | 47.84 | 195.00 |
| Adjustment | | 5% | -10% | -10% | -5% | 0% | -10% |
| Primary Improvements | 2,068 sf 6br2ba SFR | 3,729 sf 2br2.2ba SFR 3-car garage | 2,556 sf 3br1.1ba SFR 3-car garage | 3,680 sf ranch dwellings | Approved Plans | 2,790 sf 3br2.1ba SFR 3-car garage | 1,614 sf 2ba1ba SFR 3-car garages |
| Adjustment | | -5% | 0% | -5% | 25% | 0% | 0% |
| View | Excellent Ocean | V.Good Ocean | Mountain | Excellent Ocean | Good Ocean | Good Ocean | Good Vineyard/Ocean |
| Adjustment | | 5% | 20% | -5% | 10% | 10% | 10% |
| Amenities | Outbuildings;Water Storage;(Comm Facility Tower valued separately) | 2nd Tdrfrable Water Meter | Pond;Barn;Citrus/Av o Grove;Owned Solar; 1br2ba guesthouse | Agriculture Buildings;Pond; Mobile Home;Cor rals;Water Storag | None | Owned Solar;Out door Kitchen | Good;2Barns;Outbld g;AvoTrees;OwnedSol ar |
| Adjustment | | 0% | -5% | -5% | 5% | 0% | -5% |
| Improvements | Average "As Repaired" | Average | Average | Good | Vacant Land | Good | Average |
| Adjustment | | 0% | 0% | -5% | 0% | -5% | 0% |
| Site Utility | Good | Fair | Average | V.Good | Fair | Average | V.Good |
| Adjustment | | 20% | 5% | -5% | 20% | 5% | -5% |
| Ocean Proximity | Yes | Yes | No | Yes | Yes | No | No |
| Adjustment | | 0% | 10% | 0% | 0% | 10% | 10% |
| Gross Adjustments | (Additive) | 35% | 40% | 30% | 65% | 30% | 40% |
| Net Adjustments | (Additive) | 25% | 30% | -30% | 55% | 20% | 0% |
| Adjusted Value/Unit | Appraised | $3,375,000 | $3,413,800 | $3,605,000 | $3,482,850 | $3,662,400 | $3,586,500 |

Magnussen Appraisal

## Sales Comparison Approach Adjustment Analysis

### Transactional Adjustments

Adjustments for Financing, Conditions of Sale, and Economic Trends are based on cumulative (rather than additive) adjustments per accepted appraisal methodology.

### Property Rights

All of the comparables were purchased Fee Simple or short-term (fee simple equivalent) leased. Although the subject's leased fee is appraised, the present value of the lease cash flows is adjusted as a line item later in the report. Therefore, no adjustments are necessary for property rights.

### Financing and Conditions of Sale

All of the comparable sales were purchased with cash or cash equivalent financing. None had conditions of sale requiring adjustment.

### Economic Trends

The appraiser analyzed historical sales statistics obtained from CRMLS to study market conditions over the time span represented by the comparable sales. The median sale price including Cambria and Cayucos markets increased 4%/year (rounded) during the time span represented by the comparables. Market conditions adjustments are made accordingly, rounded to the nearest 1%. Sale 6, an active listing, is adjusted down 10% for potential negotiations based on matched pairs.

### Physical Adjustments

Adjustments for physical characteristics are based on additive (rather than cumulative) adjustments per accepted appraisal methodology.

### Location

Median sale prices from CRMLS indicate overall similar values in Cambria and Cayucos. No adjustments are necessary (ocean proximity is adjusted for in a separate category).

### Site Size (Acres)

Adjustments for site size are based on matched pairs which generally conform to typical contributory values in the market. Although Sales 3, 4 & 6 are significantly larger than the subject, they have inferior site utility and this is considered in the adjustment amounts.

### Primary Improvements

Adjustments for primary improvements are made based on matched pairs which generally conform to typical contributory values in the market.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          59

**View**
Adjustments for view are based on matched pairs.

**Amenities**
Adjustments for level of amenities are based on cost/depreciation considerations, typical contributory values, and/or matched pairs.

**Improvements Condition**
The subject is in overall "average" condition "as repaired." Sales 3 & 5 had improvements in superior "good" condition and are adjusted down based on matched pairs.

**Site Utility**
The subject has good site utility. Sales 1 & 4 have inferior fair site utility due to steep terrain. Sales 2 & 5 have average utility. Sales 3 & 6 have a higher degree of superior site utility as they are in the Williamson Act. Adjustments are made based on matched pairs.

**Ocean Proximity**
Ocean proximity adjustments are made based on matched pairs.

## Cost to Cure Deferred Maintenance

The appraiser was provided a cost estimate from Padre Associates indicating a $106,800 cost to test for asbestos to prepare for demolition/removal of the obsolete buildings. The property owner provided two estimates for all other deferred maintenance. One was based on his knowledge and understanding; and the second was based on an AI-based service called Grok AI. The Grok AI figures range widely and are speculative as they are AI-driven. The owner's initial estimate is also speculative as it is not based on professional estimates, which were not available or provided to the appraiser. The following repairs are needed:

Asbestos testing and removal in 21 large and 7 small buildings; landfill/lead based paint removal/hazmat fees; demolition of 2 steel towers and one 20,420 sf concrete building; demolition of a remaining 55,432 sf; recycling, dismantling, cleaning; septic cistern remediation; foundation removal; county permit/oversight fees; professional engineering costs; replacement of 6 power transformers; culvert repair; and well pump and water tank repair.

The owner's initial estimate (combined with the cost from Padre Associates for the asbestos testing) totals $2,559,384. The owner-provided Grok AI estimate totals $3,150,968 (combined with the Padre Associates asbestos testing cost and owner-provided figures for Culvert and well pump/water tank repair). The appraiser gave weight to both estimates, resulting in the following concluded cost to cure outlined below:

| Item | Reconciled | Owner | Grok AI |
|---|---|---|---|
| Asbestos Testing | $106,800 | $106,800 | $106,800 * |
| Asbestos Removal of 21 large & 7 small bldgs | $427,500 | $455,000 | $400,000 |
| Landfill/LBP Removal/Hazmat Fees | $50,000 | $140,000 | $50,000 |
| Demo of 2 Steel Towers/20,420 SF Conc. bldg | $709,500 | $408,400 | $1,010,600 ** |
| Demo of Remaining 55,432 SF | $866,376 | $794,184 | $938,568 ** |
| Recycling/Dismantling/Cleaning | $30,000 | $10,000 | $50,000 |
| Septic Cistern Remediation | $50,000 | $100,000 | $50,000 |
| Foundation Removal | $300,000 | $300,000 | $300,000 *** |
| County Permit/Oversight Fees | $50,000 | $50,000 | $50,000 *** |
| Professional Engineering Costs | $49,668 | $60,000 *Grok AI | $60,000 |
| Replacement of 6 power transformers | $90,000 | $90,000 *Grok AI | $90,000 |
| Culvert Repair | $30,000 | $30,000 | $30,000 *** |
| Well pump & water tank repair | $15,000 | $15,000 | $15,000 *** |
| Subtotal | $2,774,844 | $2,559,384 | $3,150,968 |
| 10% Contingency | $277,484 | | *Provided by Padre Associates |
| Total | $3,052,328 | | **Adjusted for foundation/permit/oversight overlap |
| Rounded | $3,050,000 | | *** Owner Provided |

**Cost to Cure Reconciliation**

Full weight is given to the Padre Associates estimate for asbestos testing. Equal weight is given to the owner and Grok AI estimates for the asbestos removal of 21 large and 7 small buildings as the range is relatively tight. Primary weight is given to the Grok AI estimate for landfill, lead based paint removal, and hazmat fees as the Grok AI estimate is considered slightly more accurate for this category.

Equal weight is given to Grok AI and the owner estimates for the demo of 2 steel towers/1 20,420 sf concrete building and demolition of the remaining 55,432 sf. Equal weight is given to both estimates for recycling/dismantling/cleaning. The septic cistern remediation indicated by Grok AI is given primary weight as it cites sources and is slightly more reliable than the owner estimate. The owner provided foundation removal, county permit/oversight fees, culvert repair, and well pump/water tank repair which is utilized in the analysis. Grok AI was the only source provided for professional engineering costs which are near a typical 2.0% which is utilized in the analysis. As Grok AI provided a wide range for the replacement of 6 power transformers, a conclusion of $15,000 per transformer near the mid-point of the range is utilized. A 10% contingency is estimated as a typical buyer would account for a buffer for unforeseen expenses and/or developer costs. Entrepreneurial profit is not applied as this is typically not considered by owner-users (the subject's most likely buyer).

As described previously, due to the complexity of the remediation and demolition/removal of the subject's obsolete structures, with no professional cost estimates provided (except for asbestos remediation by Padre Associates), this appraisal utilizes the extraordinary assumption that the cost to cure utilized herein is substantially correct (as the appraiser is not a repair expert and industry cost manuals such as Marshall & Swift do not provide meaningful results for this level of project scope.)

## Present Value of the Leased Fee

As discussed, although the subject's transmission/communications facility/tower improvements are leased to 5 tenants, the leased fee interest of 3 of the tenant leases are owned by a third party and this requires the subject owner to maintain the structures until 2064. The remaining two tenants have the following lease parameters:

1. Adelman Broadcasting, Inc. initially leased the tower/communications facility in 2006 and renewed the lease in October 2021 for a three-year term and two additional three-year terms; with expiration in September 2030; and has annual 2.5% increases. The first renewal option was exercised it is anticipated that the final option will also be exercised. The owner stated that current rent is $2,491/month.

2. Ranch WiFi initially leased the tower/communications facility on December 28, 2015 for a 20-year term (expiring in December 2035) with 5.0% annual increases and no renewal options. The owner stated that current rent is $561/month.

## Discounted Cash Flow

In order to determine the present value of the estimated lease payments attributable to the tower/communication facility (and accounting for expenses), a discounted cash flow analysis is conducted. Scheduled income and increases are utilized during the remaining length of each term (with the last Adelman Broadcasting Inc. renewal option anticipated to be exercised). After expiration of the terms, since the owner is still required to keep and maintain the facility through 2064 (per the agreement with the third-party lessor of the other three tenants), it is anticipated that when the subject's two tenants' terms expire, they will either renew again or new tenants will occupy the facility.

Based on typical CPI increases, an inflation factor of 3% is utilized for anticipated annual rent increases *after* the current terms expire. The property owner stated that the annual cost to maintain the facility is roughly $3,000. This is utilized in the analysis with the same inflation factor of 3% per year. As the current transmission tower will need replacement in 5-10 years per the owner, a 5-year replacement would likely be considered by a typical buyer and is applied in year 2030 at the owner's reported estimate of $300,000. Replacement reserves are not applied given the new tower estimated to be replaced 2030 not anticipated to need replacement by 2064 given changing technology and the possibility of the facility being obsolete by that time. No residual value is anticipated. Vacancy/turnover is anticipated to be nominal.

## Discount Rate

Communication towers are considered higher risk assets than safer assets given the uncertainty of technology changes in the future. However, as the facility is anticipated to be replaced in 2030 and required to be maintained until 2064, this lessens the risk somewhat. With safe rates hovering near 5% and high-risk assets having discount rates as high as 20%, a discount rate at the mid-to-upper end of the range of **15%** is selected. The present value of the cash flows is calculated on the following page.

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          63

| Year | 2025 (7 mos) | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|
| Rent – Adelman | $17,437 | $30,639 | $31,405 | $32,190 | $32,995 | $33,820 |
| Rent – Ranch WiFi | $3,927 | $7,069 | $7,422 | $7,793 | $8,183 | $8,592 |
| Expenses | -$3,000 | -$3,090 | -$3,183 | -$3,278 | -$3,377 | -$303,478 |
| Net Income | $18,364 | $34,618 | $35,645 | $36,705 | $37,801 | -$261,066 |
| Present Value | $15,969 | $26,176 | $23,437 | $20,986 | $18,794 | -$112,866 |

| Year | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|---|---|
| Rent – Adelman | $34,835 | $35,880 | $36,956 | $38,065 | $39,207 | $40,383 |
| Rent – Ranch WiFi | $9,022 | $9,473 | $9,946 | $10,444 | $10,966 | $11,295 |
| Expenses | -$3,582 | -$3,689 | -$3,874 | -$4,068 | -$4,271 | -$4,485 |
| Net Income | $40,274 | $41,663 | $43,028 | $44,441 | $45,901 | $47,193 |
| Present Value | $15,141 | $13,620 | $12,231 | $10,985 | $9,866 | $8,821 |

| Year | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 |
|---|---|---|---|---|---|---|
| Rent – Adelman | $41,594 | $42,842 | $44,127 | $45,451 | $46,815 | $48,219 |
| Rent – Ranch WiFi | $11,634 | $11,983 | $12,342 | $12,712 | $13,094 | $13,486 |
| Expenses | -$4,619 | -$4,758 | -$4,900 | -$5,047 | -$5,199 | -$5,355 |
| Net Income | $48,609 | $50,067 | $51,569 | $53,116 | $54,710 | $56,351 |
| Present Value | $7,900 | $7,076 | $6,338 | $5,676 | $5,084 | $4,553 |

| Year | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 |
|---|---|---|---|---|---|---|
| Rent – Adelman | $49,666 | $51,156 | $52,691 | $54,271 | $55,899 | $57,576 |
| Rent – Ranch WiFi | $13,891 | $14,308 | $14,737 | $15,179 | $15,634 | $16,104 |
| Expenses | -$5,515 | -$5,681 | -$5,851 | -$6,027 | -$6,208 | -$6,394 |
| Net Income | $58,041 | $59,783 | $61,576 | $63,424 | $65,326 | $67,286 |
| Present Value | $4,078 | $3,653 | $3,272 | $2,930 | $2,624 | $2,351 |

| Year | 2049 | 2050 | 2051 | 2052 | 2053 | 2054 |
|---|---|---|---|---|---|---|
| Rent – Adelman | $59,304 | $61,083 | $62,915 | $64,803 | $66,747 | $68,749 |
| Rent – Ranch WiFi | $16,587 | $17,084 | $17,597 | $18,125 | $18,668 | $19,228 |
| Expenses | -$6,586 | -$6,783 | -$6,987 | -$7,196 | -$7,412 | -$7,635 |
| Net Income | $69,305 | $71,384 | $73,525 | $75,731 | $78,003 | $80,343 |
| Present Value | $2,105 | $1,886 | $1,689 | $1,513 | $1,355 | $1,213 |

| Year | 2055 | 2056 | 2057 | 2058 | 2059 | 2060 |
|---|---|---|---|---|---|---|
| Rent – Adelman | $70,812 | $72,936 | $75,124 | $77,378 | $79,699 | $82,090 |
| Rent – Ranch WiFi | $19,805 | $20,399 | $21,011 | $21,642 | $22,291 | $22,960 |
| Expenses | -$7,864 | -$8,100 | -$8,343 | -$8,593 | -$8,851 | -$9,116 |
| Net Income | $82,753 | $85,236 | $87,793 | $90,427 | $93,140 | $95,934 |
| Present Value | $1,087 | $973 | $872 | $781 | $699 | $626 |

| Year | 2061 | 2062 | 2063 | 2064 | | |
|---|---|---|---|---|---|---|
| Rent – Adelman | $84,553 | $87,089 | $89,702 | $92,393 | | |
| Rent – Ranch WiFi | $23,649 | $24,358 | $25,089 | $25,841 | | |
| Expenses | -$9,390 | -$9,671 | -$9,962 | -$10,260 | | |
| Net Income | $98,812 | $101,776 | $104,829 | $107,974 | | |
| Present Value | $561 | $502 | $450 | $403 | | |

| Discount Rate | 15.00% | | | Net Present Value | $135,411 |
|---|---|---|---|---|---|
| | | | | Rounded | $140,000 |

Magnussen Appraisal

## Sales Comparison Approach Conclusion

Before adjustment, the comparable sales range from $2,100,000 to $5,000,000. After adjustment, the adjusted values are tightened, ranging from $3,375,000 to $3,662,400. The mean is $3,520,925 and the median is $3,534,675. A trimmed mean has been calculated by eliminating the highest and lowest values. The trimmed mean is $3,522,038.

| MEASURES OF CENTRAL TENDENCY | | | |
|---|---|---|---|
| **Before Adjustment** | | **After Adjustment** | |
| Minimum | $2,100,000 | Minimum | $3,375,000 |
| Maximum | $5,000,000 | Maximum | $3,662,400 |
| Mean | $3,197,500 | Mean | $3,520,925 |
| Median | $2,750,000 | Median | $3,534,675 |
| Trimmed Mean | $3,125,000 | Trimmed Mean | $3,522,038 |
| | | **As Repaired Conclusion** | **$3,530,000** |
| | | **Minus Deferred Maintenance** | **-$3,050,000** |
| | | **Plus Present Value of Leased Fee** | **$140,000** |
| | | **As Is Conclusion** | **$620,000** |

After careful consideration of the market data, and the definition of market value, the "As Repaired" fee simple value of the subject property is concluded near the measures of central tendency at $3,530,000. Deducting the anticipated cost to cure deferred maintenance of $3,050,000 and adding the present value of the leased fee of $140,000 results in a concluded "As Is" value of:

### $620,000 rounded

## Final Reconciliation

The process of reconciliation involves the analysis of each approach to value. The quality of data applied, the significance of each approach as it relates to market behavior, and the defensibility of each approach are considered and weighed. Finally, each is considered separately and comparatively with each other. The value indications resulting from each approach and the reconciled conclusions are outlined as:

| Reconciliation of Value | |
|---|---|
| As of June 20, 2025 | |
| **Approach** | **Value** |
| Cost | N/A |
| Sales Comparison | $620,000 |
| Income | N/A |
| **As Is Value Conclusion** | **$620,000** |
| Exposure Time | 3 to 6 months |

The Income and Cost Approaches were not applicable or developed. The Sales Comparison Approach reflects relevant results for properties of this type. It is the only applicable approach to value, and is given full weight in the Final Reconciliation.

## Value Conclusion

Based on the data and analyses developed in this appraisal, the reconciled As Is Market Value conclusion that represents the subject's Highest and Best Use, is:

**$620,000**

**Six Hundred Twenty Thousand Dollars**

The value conclusion is effective as of June 20, 2025, subject to the Limiting Conditions and Assumptions of this appraisal.

## Exposure Time

Based on typical marketing/exposure times seen in the market, the subject's estimated exposure time is concluded at:

**3 to 6 months**

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA    66

## Certification Statement

Kristen M. Magnussen certifies, that, to the best of her knowledge and belief, that:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are personal, unbiased professional analyses, opinions and conclusions.

Kristen M. Magnussen has no present or contemplated future interest in the property that is the subject of this report and has no personal interest or bias with respect to the parties involved.

Compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

The analyses, opinions and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP).

Kristen M. Magnussen made a personal inspection of the subject property.

Kristen M. Magnussen has not performed services as an appraiser regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Kristen M. Magnussen certifies sufficient competence to appraise this property through education and experience, in addition to the internal resources of the appraisal firm.

The value conclusions(s) and other opinions expressed herein are not based on a requested minimum value, a specific value or approval of a loan.

The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

The use of this report is subject to the requirements of the Appraisal Institute relating to the review by its duly authorized representatives.

As of the date of this report, Kristen M. Magnussen has completed the continuing education program for Candidates of Designation of the Appraisal Institute.

No persons outside the signatory of this report provided professional assistance in the development of this appraisal.

_Kristen Magnussen_                        June 24, 2025

_____

Kristen M. Magnussen
Certified General License No. AG043553
Expiration: January 15, 2026

Magnussen Appraisal

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA     67

## Addenda

Legal Description
Definitions
General Assumptions and Limiting Conditions
Lease Excerpts
Subject Improvements List
Appraiser's Certified General License
Appraiser's Qualifications

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          68

## Legal Description

The following Legal Description was obtained from Realist.com:

**MORROW TR PTN LT C**

# Definitions

**Market Value Definition**
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress[1].

**Fee Simple Interest Definition**
Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat[2].

**Leased Fee Interest Definition**
The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires[3].

**Hypothetical Condition Definition**
A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist as of the effective date of the assignment results, but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis[4].

**Extraordinary Assumption Definition**
An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions of trends; or about the integrity of data used in an analysis[5].

**Encroachment Definition**
Encroachment is the situation that exists when a structure is built in whole or in part on a neighbor's property[6].

---

[1] The Appraisal Institute's Dictionary of Real Estate Appraisal, 6th Edition
[2] The Appraisal Institute's Dictionary of Real Estate Appraisal, 6th Edition
[3] The Appraisal Institute's Dictionary of Real Estate Appraisal, 6th Edition
[4] The Appraisal Foundation, USPAP 2024-2025 Edition
[5] The Appraisal Foundation, USPAP 2024-2025 Edition
[6] USLegal.com

**Exposure Time Definition**
The time a property remains on the market.

The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market. Exposure time is always presumed to occur prior to the effective date of the appraisal. The overall concept of reasonable exposure encompasses not only adequate, sufficient and reasonable time but also adequate, sufficient and reasonable effort. Exposure time is different for various types of real estate and value ranges and under various market conditions. (Appraisal Standards Board of the Appraisal Foundation, Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions.")

Market value estimates imply that an adequate marketing effort and reasonable time for exposure occurred prior to the effective date of the appraisal. In the case of disposition value, the time frame allowed for marketing the property rights is somewhat limited, but the marketing effort is orderly and adequate. With liquidation value, the time frame for marketing the property rights is so severely limited that an adequate marketing program cannot be implemented. (The Report of the Appraisal Institute Special Task Force on Value Definitions qualifies exposure time in terms of the three above-mentioned values.)[1]

[1] Ibid

## General Assumptions and Limiting Conditions

A civil rights act passed by Congress guaranteeing individuals with disabilities equal opportunity in public accommodations, employment, transportation, government services, and telecommunications. Statutory deadlines become effective on various dates between 1990 and 1997. Magnussen Appraisal, LLC has not made a determination regarding the subject's ADA compliance or non-compliance, nor are we qualified to do so. Non-compliance could have a negative impact on value, however this has not been considered or analyzed in this appraisal.

Acceptance of and/or use of this report constitutes acceptance of the following limiting conditions and assumptions; these can only be modified by written documents executed by both parties.

This appraisal is to be used only for the purpose stated herein. While distribution of this appraisal in its entirety is at the discretion of the client, individual sections shall not be distributed; this report is intended to be used in whole and not in part.

No part of this appraisal, its value estimates or the identity of the firm or the appraiser(s) may be communicated to the public through advertising, public relations, media sales, the searchable internet, or other media.

All files, work papers and documents developed in connection with this assignment are the property of Magnussen Appraisal, LLC. Information, estimates and opinions are verified where possible, but cannot be guaranteed. Plans provided are intended to assist the client in visualizing the property; no other use of these plans is intended or permitted.

No hidden or unapparent conditions of the property, subsoil or structure, which would make the property more or less valuable, were discovered by the appraiser(s) or made known to the appraiser(s). No responsibility is assumed for such conditions or engineering necessary to discover them. Unless otherwise stated, this appraisal assumes there is no existence of hazardous materials or conditions, in any form, on or near the subject property.

Unless stated herein, the property is assumed to be outside of areas where flood hazard insurance is mandatory. Maps used by public and private agencies to determine these areas are limited with respect to accuracy. Due diligence has been exercised in interpreting these maps, but no responsibility is assumed for misinterpretation.

Good title, free of liens, encumbrances and special assessments is assumed. No responsibility is assumed for matters of a legal nature.

Necessary licenses, permits, constraints, legislative or administrative authority from any local, state or Federal government or private entity are assumed to be in place or reasonably obtainable.

It is assumed there are no zoning violations, encroachments, easements, or other restrictions which would affect the subject property, unless otherwise stated.

The appraiser(s) are not required to give testimony in Court in connection with this appraisal. If the appraisers are subpoenaed pursuant to a court order, the client agrees to pay the appraiser(s) our regular per diem rate plus expenses.

Appraisals are based on the data available at the time the assignment is completed. Amendments/modifications to appraisals based on new information made available after the appraisal was completed will be made, as soon as reasonably possible, for an additional fee.

The appraiser is not aware of any soil or environmental conditions other than those described herein, but is not an expert in these matters. The reader is advised to consult a geotechnical expert if soil or environmental issues are of concern.  Soil and environmental conditions are assumed to be adequate (unless described otherwise) for the highest and best use appraised, free of contamination and/or other conditions that would affect value.

The appraiser did not observe any structural concerns upon inspection (unless explicitly described otherwise).  However, the appraiser is not an expert in matters regarding foundation integrity and/or structural building issues.  A building engineer should be consulted if there is a concern regarding soil stability and/or structural integrity.

A title report was not provided.  This appraisal is conducted under the general assumption that no adverse easements, encumbrances, or other title exceptions exist that would impact the value of the subject at its appraised Highest and Best Use.

# LEASE EXCERPTS

## ADELMAN BROADCASTING INC

3. Term. This Lease shall commence upon the date first written above and shall continue for a term of three (3) years thereafter. This Lease shall automatically renew for two (2) consecutive three (3)-year terms provided Lessee shall have the right to terminate this Lease upon a written notice to Lessor within ninety (90) days prior to the end of the then current term. Any renewal of this Lease as described herein shall be subject to the same terms and conditions set forth herein.

4. Lease Payment.

(a)      Commencing upon October 1, 2021, the monthly Lease Payment shall be Two Thousand Three Hundred Fourteen Dollars and Ninety-One Cents ($2,314.91). Payments shall be due the first (1st) day of each month during the Term hereof and payments made after the tenth (10th) day of each month shall incur a late charge of Fifty Dollars ($50.00).

KTEA (FM) and KCJZ (FM)                              1
Tower Site Lease 10.1.21

(b)      The Lease Payment specified herein shall increase annually by two and one-half percent (2.5%).

5. Early Termination. In the event Lessee terminates this Lease prior to the term described in Paragraph 3, Lessee shall pay as Liquidated Damages to Lessor an amount equal to three (3) months' payments provided, however, that if Lessor terminates pursuant to Paragraphs 7 and/or 14 herein, Lessee shall have no further liability under this Agreement.

## RANCH WIFI

**Term.** The term of this Lease Agreement ("Term") shall be ~~Ten (10) years~~ Twenty (20) Years, commencing From Contract Execution Date of December 28, 2015 . Lease is fully executed when the tower site is fully completed and operational. This lease will automatically renew for the same term that just expired unless written notice of termination is given by either party at least 30 days before the end of the term.

**3. Rent. (a) Rent.** Within ten (10) days of the Commencement Date, Lessee shall pay Lessor, as rent, the sum of three hundred and eighty ($380.00) ("Rent") per month. Rent shall be payable on the first day of each month. Upon termination, payment shall be prorated for whatever the final fractional month of this Lease Agreement. Rent is to be paid in advance, without demand or invoice, to the Lessor as an electronic payment to Lessor. If electronic payment is not available, Lessee is to make payments by U.S. Mail with the Lessor at the contact address specified. Notices and Deliveries: If payment is not received by the 10th of the month, a "Late Fee" of ten percent (10%) will be due, and payable without demand by addition to the past-due Rent.

**(b) High-speed Internet Service.** Lessee shall provide Lessor with up to 20 Mbps symmetric Internet service for Lessor's use. The Lessee shall maintain this level of service (or better), to Lessor for the term of the Lease Agreement. Escalator: The rent shall increase each year by 5% over the rent for the immediately preceding year.

## SUBJECT IMPROVEMENTS LIST

**Cambria Buildings  Footage**

| Number + Military number + name | sq feet |
|---|---|
| 1.  Mil. No.  100 operations building | 8736 |
| 2.  Mil. No.  101 maintenanc | 1620 |
| 3.  Mil. No.  102 power building | 2539 |
| 4.  Mil. No.  103 protective  shelter (bunker) | 800 |
| 5.  Mil. No.  104 high tower | 7228 |
| 6.  Mil. No.  106 transmission building | 858 |
| 7.  Mil. No.  108 steel tower | |
| 8.  Mil. No.  109 paint storage (lab I) | 156 |
| 9.  Mil. No.  110 water pump house | 614 |
| 10. Mil. No.  111 upper gate house | 96 |
| 11. Mil. No.  116 lower tower | 4456 |
| 12. Mil. No.  117 lab II | 156 |
| 13. Mil. No.  118 water pump shed | 120 |
| 14. Mil. No.  124 carpenter | 2412 |
| 15. Mil. No.  200 admin (manager home) | 2068 |
| 16. Mil. No.  202 officers housing | 6400 |
| 17. Mil. No.  204 mess hall | 2072 |
| 18.Mil.  No.  205 lower gate house | 96 |
| 19. Mil. No.  206 officer's club | 2988 |
| 20. Mil. No.  208 dormitory 1 | 5860 |
| 21. Mil. No.  210 boiler room | 860 |
| 22. Mil. No.  211 fire pump shack | 260 |
| 23. Mil. No.  212 dormitory 2 | 3767 |
| 24. Mil. No.  216 dormitory 3 | 5860 |
| 25. Mil. No.  218 dormitory 4 | 3767 |
| 26. Mil. No.  220 dormitory 5 | 5860 |
| 27. Mil. No.  225 base comm. store | 2092 |
| 28. Mil. No.  226 PX | 1056 |
| 29. Mil. No.  227 bowling theater | 4635 |
| 30. Mil. No.  228 motor pool | 1368 |
| 31. Mil. No.  232 subt. water tanks/cisterns | |
| 32. Mil. No.  3001 Communications building | 800 |
| total | 79600 |

Single Family Residence on 34.16 Acres – 202 Monte Cristo Place, Cambria CA          75



Business, Consumer Services & Housing Agency

BUREAU OF REAL ESTATE APPRAISERS
REAL ESTATE APPRAISER LICENSE

Kristen M. Magnussen

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:          AG 043553

Effective Date:          January 16, 2024
Date Expires:            January 15, 2026

Angela Jemmott, Bureau Chief, BREA

3074161

# KRISTEN M. MAGNUSSEN

## CERTIFIED GENERAL REAL ESTATE APPRAISER - MAGNUSSEN APPRAISAL, LLC

1577 Berwick Drive, Cambria CA 93428
www.magnussenappraisal.com
magnussenappraisal@aol.com   760-809-7325

## QUALIFICATIONS
Certified General Real Estate Appraiser
Candidate for Designation, Appraisal Institute

## STATE CERTIFICATIONS
California — AG043553
Utah — 13450970-CG00
Washington — 23018778
South Dakota — 1696CG-R
West Virginia — CG3093

## APPRAISAL EXPERIENCE
Magnussen Appraisal, LLC - Nationwide
*Owner, Certified General Real Estate Appraiser — April 2012-Present*
Provide commercial and residential appraisals
Perform commercial appraisal reviews for nationwide real estate advisory firms
Provide real estate consulting for litigation and estate purposes

Confidential Commercial Appraisal Advisory Firm - Nationwide
*Chief Reviewer — January 2017-July 2022*
*Commercial Review Appraiser — June 2016-July 2022*
Completed nationwide commercial reviews for a wide variety of property types
Supervised commercial appraisal reviews completed by other review appraisers for AMCs

Confidential MAI Appraisal Firm — San Diego, CA
*Certified General Real Estate Appraiser — March 2012-June 2016*
*Real Estate Appraiser Trainee — August 2007-March 2012*
Completed commercial appraisals for public agencies, owners, and attorneys
Completed consulting assignments with emphasis in eminent domain and litigation
Completed all steps of appraisal process under supervision of 20+ year MAI appraiser

## OTHER REAL ESTATE & FINANCE RELATED EXPERIENCE
Equity 1 Lenders Group — San Diego, CA
*Mortgage Loan Originator — June 2003-May 2004*

Morgan Stanley — Charlottesville, VA
*Financial Assistant/Teller — July 2002-June 2003*

Judy Savage, Real Estate Broker — Charlottesville, VA
*Real Estate Broker Assistant — January 1999-July 1999*

Real Estate III — Charlottesville, VA
*Real Estate Office Assistant — September 1998-January 1999*

## APPRAISAL-SPECIFIC EDUCATION (2007-2025)

### *Appraisal Institute*

Advanced Income Capitalization
Advanced Concepts & Case Studies
Quantitative Analysis
Advanced Market Analysis & Highest and Best Use
General Market Analysis & Highest and Best Use
General Report Writing and Case Studies
General Income Approach
General Site Valuation & Cost Approach
General Sales Comparison Approach
Review Theory (General)
Allocating Components in Going Concern Appraisals
Real Estate Finance Statistics and Valuation Modeling
Unleash Tempo 5: Using the MLS for Appraisers
Residential Site Valuation & Cost Approach
Residential Sales Comparison & Income Approaches
Residential Report Writing and Case Studies
Business Practices and Ethics

### *McKissock Learning*

Market Disturbances – Appraisals in Atypical Markets and Cycles
Divorce and Estate Appraisals: Elements of Non-Lender Work
The Basics of Expert Witness for Commercial Appraisers
Best Practices for Completing Bifurcated and Hybrid Appraisals
Appraisal of REO and Foreclosure Properties
Commercial Land Valuation
Appraisal of Fast-Food Facilities
New Construction Essentials: Luxury Homes
Understanding Luxury Home Features & Fundamentals of Appraising Luxury Homes
California Elimination of Bias and Cultural Competency for Appraisers
7-Hour USPAP Update
Federal Laws & Regulations
Appraising Assisted Living Facilities

### *Kaplan Schools*

Uniform Standards of Professional Appraisal Practice
Residential Real Estate Appraisal
Legal Considerations in Appraisal
Math & Regulations in Appraisal

## FORMAL & TECHNICAL EDUCATION

**Appraisal Institute, McKissock Learning and Kaplan Schools**
500+ Hours of appraisal-specific technical education outlined above; 2007-2025

**College Coursework - Mira Costa College and Piedmont Virginia Community College**
Completion of 45 college semester credits with emphasis in real estate, business administration, mathematics, macro- and micro-economics, finance, business law, English, accounting, statistical analysis, and electives; 1999-2011

**Western Albemarle High School, Crozet VA**
High School Diploma; 1998

# EXHIBIT B



CALIFORNIA
ASSOCIATION
OF REALTORS®

### DISCLOSURE REGARDING
### REAL ESTATE AGENCY RELATIONSHIP
**(As required by the Civil Code)**
**(C.A.R. Form AD, Revised 12/24)**

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code §§ 2079.13(j), (k), and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**
A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b) A duty of honest and fair dealing and good faith.
    (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**
A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. This includes a Buyer's agent under a buyer-broker representation agreement with the Buyer. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b) A duty of honest and fair dealing and good faith.
    (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**
A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b) Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**
Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.
The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.
If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.
Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.
Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of §§ 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully.**

**Note: Real estate broker commissions are not set by law and are fully negotiable.**

**I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE SECOND PAGE.**

☐ Buyer ☒ Seller ☐ Landlord ☐ Tenant _____ *Bks Cambria LLC* Date _____

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant _____ Date _____

Agent _____ *Jack Posemsky Real Estate* _____ DRE Lic. # *01184353*
                                Real Estate Broker (Firm)

By _____ *Jack Posemsky* DRE Lic. # *01184353* _____ Date _____
               (Salesperson or Broker-Associate, if any)

AD REVISED 12/24 (PAGE 1 OF 2)

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

**CIVIL §§ 2079.13 - 2079.24 (2079.16 APPEARS ON THE FRONT)**

**2079.13.** As used in this section and §§ 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings: **(a)** "Agent" means a person acting under provisions of Title 9 (commencing with § 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with § 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes a vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with § 1940) of Title 5, (3) a mobilehome, as defined in § 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in § 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of § 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in § 18007 of the Health and Safety Code, or a mobilehome as defined in § 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in § 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Single-family residential property" or "single-family real property" means any of the following: (1) Real property improved with four or fewer dwelling units, including a leasehold exceeding one year's duration. (2) A unit in a residential stock cooperative, condominium, or planned unit development. (3) A mobilehome or manufactured home when offered for sale or sold through a real estate broker pursuant to § 10131.6 of the Business and Professions Code. **(m)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of § 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(n)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(o)** "Buyer's agent" means an agent who represents a buyer in a real property transaction. **(p)** "Buyer-broker representation agreement" means a written contract between a buyer of real property and a buyer's agent by which the buyer's agent has been authorized by the buyer to provide services set forth in subdivision (a) of § 10131 of the Business and Professions Code for or on behalf of the buyer for which a real estate license is required pursuant to the terms of the contract.

**2079.14. (a)** A copy of the disclosure form specified in § 2079.16 shall be provided in a real property transaction as follows: (1) The seller's agent, if any, shall provide the disclosure form to the seller before entering into a listing agreement. (2) The buyer's agent shall provide the disclosure to the buyer as soon as practicable before the execution of a buyer-broker representation agreement and execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer. **(b)** The agent providing the disclosure form specified in § 2079.16 shall obtain a signed acknowledgement of receipt from the buyer or seller except as provided in § 2079.15.

**2079.15.** In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to § 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17(a)** As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller. **(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form:

| | | |
|---|---|---|
| Seller's Brokerage Firm | DO NOT COMPLETE. SAMPLE ONLY | License Number _____ |

Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)

| | | |
|---|---|---|
| Seller's Agent | DO NOT COMPLETE. SAMPLE ONLY | License Number _____ |

Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

| | | |
|---|---|---|
| Buyer's Brokerage Firm | DO NOT COMPLETE. SAMPLE ONLY | License Number _____ |

Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)

| | | |
|---|---|---|
| Buyer's Agent | DO NOT COMPLETE. SAMPLE ONLY | License Number _____ |

Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by § 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

**2079.18** (Repealed pursuant to AB-1289)

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of § 2079.14 and § 2079.17 are complied with.

**2079.21 (a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

**2079.23 (a)** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship. **(b)** A lender or an auction company retained by a lender to control aspects of a transaction of real property subject to this part, including validating the sales price, shall not require, as a condition of receiving the lender's approval of the transaction, the homeowner or listing agent to defend or indemnify the lender or auction company from any liability alleged to result from the actions of the lender or auction company. Any clause, provision, covenant, or agreement purporting to impose an obligation to defend or indemnify a lender or an auction company in violation of this subdivision is against public policy, void, and unenforceable.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC. *a subsidiary of the California Association of REALTORS®*

**AD REVISED 12/24 (PAGE 2 OF 2)**

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**

# EXHIBIT B1



CALIFORNIA
ASSOCIATION
OF REALTORS®

# COMMERCIAL AND RESIDENTIAL INCOME
# LISTING AGREEMENT
**(May be used for commercial and any residential
income property regardless of number of units)**
(C.A.R. Form CLA, Revised 6/25)

**Date Prepared:** *August 15, 2025*

1. **EXCLUSIVE AUTHORIZATION:** _____ *Bks Cambria LLC* _____ ("Owner")
   hereby employs and grants _____ *Jack Posemsky Real Estate* _____ ("Broker")
   the exclusive and irrevocable right to: [X] SELL, [ ] LEASE, [ ] EXCHANGE, [ ] OPTION, or [ ] OTHER _____
   the real property described as _____ *202 Monte Cristo Pl* _____,
   situated _____ *Cambria* _____ (City), _____ *San Luis Obispo* _____ (County), California, ____ *93428* ____ (Zip Code).
   Assessor's Parcel No. ___ *013-181-005* ___ ("Property") for the Listing Period in **paragraph 2A(1)**.

2. **TERMS OF LISTING AGREEMENT:** The items in this paragraph are contractual terms of the Agreement. Referenced paragraphs
   provide further explanation. This form is 6 pages. Owner is advised to read all 6 pages.

| Para # | Paragraph Title or Contract Term | Terms and Conditions |
|---|---|---|
| **A** | **Representation** | |
| **A(1)** | Listing Period<br><br>(Maximum Length) | Beginning on _08/15/2025_ (date) and Ending at 11:59 P.M. on _02/15/2026_ (date)<br><br>(Not to exceed 24 months if improved with one to four units and not owned by an entity. If Listing Period exceeds 24 months on a residential 1-4, this Agreement is void, unless Owner is a corporation, LLC or partnership.) |
| **A(2)** | Listing Price | *Three Million, Five Hundred Thousand* _____ Dollars ($_3,500,000.00_) |
| **B** | Property Specific Listings | [ ] Manufactured (mobile) home (C.A.R. Form MHLA attached)<br>[ ] Probate, conservatorship or guardianship (C.A.R. Form PLA attached) |
| **C** | **Compensation: NOTICE: The amount or rate of real estate commissions is not fixed by law. They are set by each broker individually and may be negotiable between Owner and Broker.** See attached Broker Compensation Advisory (C.A.R. Form BCA). | |
| **C(1)** | 4B | Compensation to Owner's Broker (only Owner's side of transaction) | _2.500_ % of the listing price AND, if any _____ OR [ ] $ _____;<br>OR [ ] see attached Broker-created compensation schedule.<br>(% above is based on purchase price if Owner and buyer sign a purchase agreement) |
| **C(2)** | 4C | [ ] Additional Compensation if Transferee is unrepresented<br><br>(Does NOT apply to dual agency) | _2.500_ % of the purchase price AND, if any _____ OR [ ] $ _____,<br>OR [ ] see attached Broker-created compensation schedule.<br>(If Broker represents both buyer and Owner, buyer side compensation shall be specified in a separate written agreement between Broker and buyer.) |
| **C(3)** | 4D(2) | Continuation of Right to Compensation for Broker Identified Prospective Transferees | The Continuation Period shall be _90_ calendar days after the Listing Period or any extension ("Continuation Period"). |
| **C(4)** | 4F | Owner Obligation to Pay Previous Brokers | Previous Listing/Other broker(s): _____<br>Compensation to above broker(s) owed if Property transferred to: _____ |
| **D** | **Items Intended to be Included and Excluded** | |
| **D(1)** | 5A | Items Included<br>[X] *Appliances in residence* | [ ] _____ ; [ ] _____ ;<br>[ ] _____ [ ] _____ |
| **D(2)** | 5A | Excluded Items<br>[X] *Personal Items* | [ ] _____ ; [ ] _____ ;<br>[ ] _____ [ ] _____ |
| **D(3)** | 5B | Leased Items:<br>[ ] Propane Tank(s); | [ ] Solar Power System(s);<br>[ ] Water Softener; | [ ] Alarm System(s); |
| **D(4)** | 5B | Liened Items:<br>[ ] Heating/Ventilation/Air conditioning systems | [ ] Solar Power System(s);<br>[ ] _____ ; | [ ] Windows or Doors; |
| **D(5)** | 5B | (a)  Smart Home Features Owner prefers to Include: _____<br>(b)  Smart Home Features Owner prefers to Exclude: _____ | |
| **E** | **MLS and Public Marketing** | |
| **E(1)** | | Property will be marketed in the following MLS | Primary *SLOCAOR* _____<br>Other(s): _____ | See C.A.R. Form MLSA, if utilizing MLS or if Residential 1-4. |

© 2025, California Association of REALTORS®, Inc.
**CLA REVISED 6/25 (PAGE 1 OF 7)**

Owner's Initials _____ / _____

**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 1 OF 7)**

Property Address: *202 Monte Cristo Pl, Cambria,  93428*      Date: *August 15, 2025*

| E(2) | 10 | **Publication of Seller willingness to consider concessions** | If checked below: (i) Seller authorizes Broker to market that Seller is willing to consider offers asking for concessions; and (ii) No amount of the possible concession will be stated in such marketing unless Seller notifies Broker in writing of the amount.<br>[X] In the MLS(s) listed above, if permitted by that MLS.<br>[ ] In any other marketing outside of the MLS | |
|---|---|---|---|---|
| E(3) | 12A | [ ] **Owner instructs Broker not to take or use photographs in marketing, except as required by MLS rules.** | | |
| **F** | | **Broker's and Owner's Duties** | | |
| F(1) | 7B | **Timing of Presentation of Offers** | Owner instructs Broker to present all offers received as soon as practicable OR<br>[ ] Offers shall be presented on _____ (date) or [ ] _____ days after the Property is listed as active on the MLS | |
| F(2) | 7C | **Transferee Supplemental Offer Letters (Transferee Letters)** | Owner instructs Broker not to present Transferee letters, OR [ ] Owner instructs Brokers to present Transferee Letters. If Owner requests or relies on Transferee Letters, Owner is acting against Broker's advice. | |
| F(3) | 7E | **Investigation Reports** | [X] Natural Hazard Disclosure<br>[ ] Structural Pest Control,<br>[ ] General Property Inspection,<br>[ ] Homeowners Association Documents,<br>[ ] Preliminary (Title) Report,<br>[ ] Roof Inspection,<br>[ ] Pool Inspection,<br>[ ] Septic/Sewer Inspection,<br>[ ] Other: | Owner shall order and pay for any reports selected within **5 (or _____) days** of the Beginning Date of this Agreement |
| **G** | 21 | **Exceptions to Ownership/Title** | | |
| **H** | | [ ] **Owner intends to include a contingency to purchase a replacement property as part of any transaction (see C.A.R. Form SPRP)** | | |
| **I** | | **Intentionally Left Blank** | | |
| **J** | 13, 14 | **Owner Opt Outs** | [ ] Key safe/Lockbox [ ] Signs | |
| **K** | | **Additional Terms** | *Seller agrees to pay a 5% commission of final sale price at close of escrow.* | |

**3    ADVISORIES AND ADDENDA:**

   **A.    Advisories**

      [X] Broker Compensation Advisory (C.A.R. Form BCA)

      [ ] REO Advisory Listing (C.A.R. Form REOL)

      [ ] Trust Advisory (C.A.R. Form TA)

      [ ] Other: _____

   **B.    Addenda.** The addenda identified below are incorporated into this Agreement.

      [ ] Short Sale Listing Addendum (C.A.R. Form SSLA)

      [X] *Form ABA*

      _____

**4.    COMPENSATION TO BROKER:**

   **Notice: The amount or rate of real estate commissions is not fixed by law. They are set by each Broker individually and may be negotiable between Owner and Broker.**

     **A.    ADVISORY:** Real estate commissions include all compensation and fees to Broker and are fully negotiable.

     **B.    COMPENSATION TO BROKER:** Owner agrees to pay to Broker as compensation for services under this Agreement, the amount specified in **paragraph 2C(1).**

     **C.    OPTIONAL ADDITIONAL COMPENSATION FOR UNREPRESENTED BUYER:** Owner agrees to pay Broker the additional amount specified in **paragraph 2C(2)**, if checked, for services rendered only if the buyer is not represented by a real estate agent. If a buyer is represented by a real estate agent, whether working through Broker or another brokerage company, then **paragraph 2C(2)** does not apply.

     **D.    COMPENSATION TERMS:** Compensation is earned, and Owner shall pay Broker as follows:

       **(1)    Completed Transaction or Owner Default:** If during the Listing Period, or any extension, Broker, cooperating broker, Owner or any other person procures a ready, willing, and able transferee(s) whose offer to purchase the Property on any price and terms is accepted by Owner, provided the transferee completes the transaction or is prevented from doing so by Owner. (Broker is entitled to compensation whenever any escrow resulting from such offer closes during or after the expiration of the Listing Period, or any extension.)

       **(2)    Continuation of Right to Compensation for Broker Procured Buyer(s):** If within the Continuation Period specified in **paragraph 2C(3)**, or the same period of time after any cancellation of this Agreement, unless otherwise agreed, Owner enters into a contract to sell, convey, lease or otherwise transfer the Property to anyone ("Prospective Transferee") or that person's related entity:

        • who physically entered and was shown the Property during the Listing Period or any extension by Broker or a cooperating broker; or

**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 2 OF 7)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201    www.lwolf.com    202 Monte Cristo

Property Address: **202 Monte Cristo Pl, Cambria,  93428**_____ Date: **August 15, 2025**_____

- for whom Broker or any cooperating broker submitted to Owner a signed, written offer to acquire, lease exchange or obtain an option on the Property.

Broker's right to compensation pursuant to this paragraph shall only apply if, prior to expiration of this Agreement or any extension, Broker delivers to Owner a written notice of the names of such Prospective Transferees (C.A.R. Form NPB).

(3) **Owner Interference with Listing:** If, without Broker's prior written consent, the Property is withdrawn from sale, conveyed, leased, rented, otherwise transferred, or made unmarketable by a voluntary act of Owner during the Listing Period, or any extension.

E. **ADDITIONAL COMPENSATION TERMS:**

(1) **Buyer Breach and Owner Recovery of Damages:** If completion of the sale is prevented by a party to the transaction other than Owner, then compensation which otherwise would have been earned under **paragraph 4** shall be payable only if and when Owner collects damages by suit, arbitration, settlement or otherwise, and then in an amount equal to the lesser of one-half of the damages recovered or the above compensation, after first deducting title and escrow expenses and the expenses of collection, if any.

(2) **Escrow Instructions:** Owner hereby irrevocably assigns to Broker the above compensation from Owner's funds and proceeds in escrow. Broker may submit this Agreement, as instructions to compensate Broker pursuant to **paragraph 4**, to any escrow regarding the Property involving Owner and a transferee, Prospective Transferee or other transferee.

F. **OWNER COMPENSATION OBLIGATIONS TO OTHER BROKERS:**

(1) Owner represents that Owner has not previously entered into a listing agreement with another broker regarding the Property, unless specified in **paragraph 2C(4)**.

(2) Owner warrants that Owner has no obligation to pay compensation to any other broker regarding the Property unless the Property is transferred to any of the individuals or entities specified in **paragraph 2C(4)**.

(3) If the Property is sold to anyone specified in **paragraph 2C(4)** during the time Owner is obligated to compensate another broker: **(i)** Broker is not entitled to compensation under this Agreement; and **(ii)** Broker is not obligated to represent Owner in such transaction.

5. A. **ITEMS EXCLUDED AND INCLUDED:** Unless otherwise specified in an agreement between Owner and transferee, all fixtures and fittings that are attached to the Property are included, and personal property items are excluded, from the purchase price. Owner intends that the items specified in **paragraph 2D** be included or excluded in offering the Property for sale, but understands that; **(i)** the purchase agreement supersedes any intention expressed above and will ultimately determine which items are excluded and included in the transaction; and **(ii)** Broker is not responsible for and does not guarantee that the above exclusions and/or inclusions will be in the purchase agreement.

B. **LEASED OR NOT OWNED ITEMS; LIENED ITEMS:** The items specified in **paragraph 2D(3)** are leased or not owned by Owner and the items specified in **paragraph 2D(4)** have been financed and a lien has been placed on the Property to secure payment. Owner will provide to the transferee, as part of the purchase agreement, copies of lease documents, or other documents obligating Owner to pay for any such leased or liened item.

C. **SMART HOME FEATURES:** The smart home features are intended to be included or excluded as specified in **paragraph 2D(5)**.

6. **OWNER REPRESENTATIONS:** Owner represents that, unless otherwise specified in writing, Owner is unaware of: **(i)** any Notice of Default recorded against the Property; **(ii)** any delinquent amounts due under any loan secured by, or other obligation affecting, the Property; **(iii)** any bankruptcy, insolvency or similar proceeding affecting the Property; **(iv)** any litigation, arbitration, administrative action, government investigation, or other pending or threatened action that affects or may affect the Property or Owner's ability to transfer it; and **(v)** any current, pending or proposed special assessments affecting the Property. Owner shall promptly notify Broker in writing if Owner becomes aware of any of these items during the Listing Period or any extension thereof.

7. **BROKER'S AND OWNER'S DUTIES:**

A. **Broker Responsibility, Authority and Limitations:** Broker agrees to exercise reasonable effort and due diligence to achieve the purposes of this Agreement. Unless Owner gives Broker written instructions to the contrary, Broker is authorized, but not required, to **(i)** order reports and disclosures including those specified in **paragraph 7E** as necessary, **(ii)** advertise and market the Property by any method and in any medium selected by Broker, including MLS and the Internet, and, to the extent permitted by these media, control the dissemination of the information submitted to any medium; and **(iii)** disclose to any real estate licensee making an inquiry the receipt of any offers on the Property and the offering price of such offers.

B. **Presentation of Offers:**

(1) **Strategies Affecting Delayed Offers and Buyer Broker Compensation:** There are different strategies for obtaining the best offer for Owner. Owner is advised that certain transferees may prefer not to be in a competitive situation and either may not make an offer if there is an instruction that all offers will be presented at a later specified time or may try to make a "preemptive" offer that will expire shortly, hoping that Owner will accept before the presentation date. Additionally, certain transferees may not be able or allowed to pay compensation to a transferee's broker. These transferees may request for Owner to pay transferee's broker through a term in the purchase agreement or through a separate compensation agreement. Owner is advised to discuss and consider the best strategy for Owner related to the presentation of offers.

(2) (A) **Owner instructs Broker to Present Offers:** Broker agrees to present all offers received for Owner's Property, and present them to Owner as soon as possible, unless Owner gives Broker written instructions to the contrary.

OR (B) **Owner instructs Broker not to Present Offers until a Later Time:** If checked in **paragraph 2F(1)**, Owner has elected to have Broker hold all offers and present them to Owner as specified in **paragraph 2F(1)**. Broker will inform Owner that an offer has come in, but will not submit offer to the Owner, unless specifically instructed otherwise, in writing. Local MLS rules may impact this practice and whether it will provide any benefit to Owner.



**CLA REVISED 6/25 (PAGE 3 OF 7)**                            Owner's Initials _____ / _____

**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 3 OF 7)**

Property Address: **202 Monte Cristo Pl, Cambria,   93428**                               Date: **August 15, 2025**

**C.** **TRANSFEREE SUPPLEMENTAL OFFER LETTERS (TRANSFEREE LETTERS):**

(1) **Advisory Regarding Transferee Letters:** Owner is advised of the practice of many transferees and their agents to include a Transferee Letter with an offer to try to influence an owner to accept the transferee's offer. Transferee Letters may include photos and video. Whether overt or unintentional, Transferee Letters may contain information about a transferee's protected class or characteristics. Deciding whether to accept an offer based upon protected classes or characteristics is unlawful. Broker will not review the content of Transferee Letters. See C.A.R. Form FHDA for further information.

(2) (A) **Owner instructs Broker not to present Transferee Letters,** whether submitted with an offer or separately at a different time. Owner authorizes Broker to specify in the MLS that Transferee Letters will not be presented to Owner.

(B) **Owner Instructs Broker to Present Transferee Letters:** If checked in **paragraph 2F(2)**, Broker advises Owner that:
**(i)** Transferee Letters may contain information about protected classes or characteristics and such information should not be used in Owner's decision to accept, reject, or counter a transferee's offer; and **(ii)** If Owner relies on Transferee Letters, Owner is acting against Broker's advice and should seek the advice of counsel before doing so.

**D.** **OWNER GOOD FAITH:** Owner agrees to consider offers presented by Broker, and to act in good faith to accomplish the sale of the Property by, among other things, making the Property available for showing at reasonable times and, subject to **paragraph 2C(4)**, referring to Broker all inquiries of any party interested in the Property. Owner is responsible for determining at what price to list and sell the Property.

**E.** **INVESTIGATIONS AND REPORTS:** Owner agrees, within the time specified in **paragraph 2F(3)**, to order and, when required by the service provider, pay for the following reports specified in **paragraph 2F(3)**. If Property is located in a Common Interest Development or Homeowners Association, Owner is advised that there may be benefits to obtaining any required documents prior to entering into escrow with any transferee. Such benefits may include, but not be limited to, potentially being able to lower costs in obtaining the documents and avoiding any potential delays or complications due to late or slow delivery of such documents.

**F.** **UNDISCLOSED CONDITIONS; INCOMPLETE OR INCORRECT INFORMATION:** Owner further agrees to indemnify, defend and hold Broker harmless from all claims, disputes, litigation, judgments, and costs arising from any incorrect or incomplete information supplied by Owner, or from any material facts that Owner knows but fails to disclose including dangerous or hidden conditions on the Property.

**8.** **DEPOSIT:** Broker is authorized to accept and hold on Owner's behalf any deposits to be applied toward the contract price.

**9.** **AGENCY RELATIONSHIP:**

**A.** **DISCLOSURE:** Owner acknowledges receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationship" (C.A.R. Form AD).

**B.** **OWNER REPRESENTATION:** Broker shall represent Owner in any resulting transaction, except as specified in **paragraph 4F(3)**.

**C.** **POSSIBLE DUAL AGENCY WITH TRANSFEREE:**

(1) **Disclosure and Consent in a Transaction:** Depending upon the circumstances, it may be necessary or appropriate for Broker to act as an agent for both Owner and transferee, exchange party, or one or more additional parties ("Transferee"). Broker shall, as soon as practicable, disclose to Owner any election to act as a dual agent representing both Owner and Transferee. If a Transferee is procured directly by Broker or an associate licensee in Broker's firm, Owner hereby consents to Broker acting as a dual agent for Owner and such Transferee. In the event of an exchange, Owner hereby consents to Broker collecting compensation from additional parties for services rendered, provided there is disclosure to all parties of such agency and compensation. Owner understands and agrees that: **(i)** Broker, without the written consent of Owner, will not disclose to Transferee that Owner is willing to transfer the Property at a price less than the listing price; **(ii)** Broker, without the prior written consent of Transferee, will not disclose to Owner that Transferee is willing to pay a price greater than the offered price; and **(iii)** except for (i) and (ii) above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties. Compensation is not necessarily determinative of agency.

(2) **Showing Properties:** Owner acknowledges that real estate brokers must have a representation agreement with a Transferee before showing residential properties to that Transferee. Owner consents to Broker entering into a Buyer Representation and Broker Compensation Agreement with a Transferee, and that by doing so the brokerage company will become a dual agent representing both Transferee and Owner.

(3) **Potentially Competing Owners and Transferees:** Owner understands that Broker may have or obtain listings on other properties, and that potential transferees may consider, make offers on, or purchase through Broker, property the same as or similar to Owner's Property. Owner consents to Broker's representation of Owners and transferees of other properties before, during and after the end of this Agreement. Owner acknowledges receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).

**D.** **UNREPRESENTED TRANSFEREES:** If a transferee who is interested in viewing Owner's Property is not already represented by a real estate broker, and such transferee refuses to be represented by Broker, Owner authorizes Broker to obtain a signed document from such Transferee refusing representation by Broker. Broker shall provide such transferees, at the earliest practicable time, a disclosure of non-representation, such as Buyer Non-Agency (CAR Form BNA) or Open House and Visitor Non-Agency Disclosure and Sign-In (C.A.R. Form OHNA-SI).

**E.** **CONFIRMATION:** Broker shall confirm the agency relationship described above, or as modified, in writing, prior to or concurrent with Owner's execution of an agreement to sell.

**F.** **TERMINATION OF AGENCY RELATIONSHIP:** Owner acknowledges and agrees that the representation duties of, and agency relationship with, Broker terminate at the expiration of this Agreement or, if it occurs first, the completion of any transaction specified in this Agreement.

CLA REVISED 6/25 (PAGE 4 OF 7)                               Owner's Initials _____ / _____

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX  75201  www.lwolf.com        202 Monte Cristo

Property Address: **202 Monte Cristo Pl, Cambria, 93428** _____ Date: **August 15, 2025**

10. **SELLER CONCESSIONS:**
- Concessions are monetary payments that a seller agrees to contribute towards a buyer's expenses and other costs a buyer is responsible for in the transaction.
- Concessions may include, but are not limited to, costs of escrow or title, lender fees, repairs, inspections and buyer broker compensation.
- Concessions specified in the MLS must be allowed to be used for any permissible buyer expense or cost and must not specify the concessions are to be used for broker compensation. However, a term in the buyer's offer may specify that the Seller agrees to pay compensation to a buyer's broker. Should Seller agree to do so, Broker does not represent, nor will Broker confirm, that the amount specified is owed by buyer to buyer's broker pursuant to a written agreement that covers Seller's property. In the absence of a separate agreement, Seller's contractual obligation to pay buyer's broker is independent of any obligation between buyer and buyer's broker.
- Concessions identified in an MLS listing are not promises to pay but instead indicate to a buyer that the seller will consider offers asking for concessions. Concessions specified in the MLS are not intended to be binding on Seller unless included in the accepted purchase agreement.

11. **SECURITY, INSURANCE, SHOWINGS, AUDIO AND VIDEO:** Broker is not responsible for loss of or damage to personal or real property, or injury to person(s), whether attributable to use of a key safe/lockbox, a showing of the Property, or otherwise. Third parties, including, but not limited to, appraisers, inspectors, brokers and prospective transferees, may have access to, and take videos and photographs of the interior of the Property. Owner agrees: **(i)** to take reasonable precautions to safeguard and protect valuables that might be accessible during showings of the Property; and **(ii)** to obtain insurance to protect against these risks. Broker does not maintain insurance to protect Owner. Persons visiting the Property may not be aware that they could be recorded by audio or visual devices installed by Owner (such as "nanny cams" and hidden security cameras). Owner is advised to post notice disclosing the existence of security devices.

12. **PHOTOGRAPHS AND INTERNET ADVERTISING:**
A. In order to effectively market the Property for sale it is often necessary to provide photographs, virtual tours and other media to transferees. Unless checked in **paragraph 2E(3)**, Owner agrees that Broker or others may photograph or otherwise electronically capture images of the exterior and interior of the Property ("Images") for static and/or virtual tours of the Property by transferees and others for use on Broker's website, the MLS, and other marketing materials and sites. Owner acknowledges that if Broker engages third parties to capture and/or reproduce and display Images, the agreement between Broker and those third parties may provide such third parties with certain rights to those Images. The rights to the Images may impact Broker's control or lack of control of future use of the Images. If Owner is concerned, Owner should request that Broker provide any third parties' agreement impacting the Images. Owner also acknowledges that once Images are placed on the internet neither Broker nor Owner has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Owner further assigns any rights in all Images to the Broker/Agent and agrees that such Images are the property of Broker/Agent and that Broker/Agent may use such Images for advertising, including post transaction and for Broker/Agent's business in the future.
B. Owner acknowledges that prospective transferees and/or other persons coming onto the Property may take photographs, videos or other images of the Property. Owner understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Owner has control over who views such Images nor what use viewers may make of the Images.

13. **KEY SAFE/LOCKBOX:** A key safe/lockbox is designed to hold a key to the Property to permit access to the Property by Broker, cooperating brokers, MLS participants, their authorized licensees and representatives, authorized inspectors, and accompanied prospective transferees. Owner further agrees that Broker, at Broker's discretion, and without further approval from Owner, shall have the right to grant access to and convey Owner's consent to access the Property to inspectors, appraisers, workers, repair persons, and other persons requiring entry to the Property in order to facilitate the sale of the Property. Broker, cooperating brokers, MLS and Association/Boards of REALTORS® are not insurers against injury, theft, loss, vandalism or damage attributed to the use of a key safe/lockbox.
A. Unless checked in **paragraph 2J**, Owner authorizes Broker to install a key safe/lockbox.
B. **TENANT OCCUPIED PROPERTY:** If Owner does not occupy the Property, Owner shall be responsible for obtaining occupant(s)' written permission for use of a key safe/lockbox (C.A.R. Form KLA).

14. **SIGN:** Unless specified in **paragraph 2J**, Owner authorizes Broker to install a FOR SALE/SOLD/LEASE sign on the Property.

15. **EQUAL HOUSING OPPORTUNITY:** The Property is offered in compliance with federal, state and local anti-discrimination laws.

16. **ATTORNEY FEES:** In any action, proceeding or arbitration between Owner and Broker arising out of this Agreement, Owner and Broker are each responsible for paying their own attorney's fees and costs, except as otherwise specified in **paragraph 19A**.

17. **MANAGEMENT APPROVAL:** If an associate-licensee in Broker's office (salesperson or broker-associate) enters into this Listing Agreement on Broker's behalf, Broker or Manager has the right to cancel this Listing Agreement, in writing, within **5 days** after its execution.

18. **SUCCESSORS AND ASSIGNS:** This Listing Agreement shall be binding upon Owner and Owner's successors and assigns.

CLA REVISED 6/25 (PAGE 5 OF 7)                        Owner's Initials _____ / _____



**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 5 OF 7)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com      202 Monte Cristo

Property Address: **202 Monte Cristo Pl, Cambria,   93428**                                    Date: **August 15, 2025**

**19.  DISPUTE RESOLUTION:**

    **A.  MEDIATION:** (1) Owner and Broker agree to mediate any dispute or claim arising between them under this Listing Agreement, before resorting to arbitration or court action. (2) Mediation fees, if any, shall be divided equally among the parties involved. (3) If, for any dispute or claim to which this paragraph applies, any party (the non-mediating party) **(i)** commences an action without first attempting to resolve the matter through mediation, or **(ii)** before commencement of an action, refuses to mediate after a request has been made, then if the non-mediating party is the losing party in any such action, the prevailing party in such action shall be entitled to recover attorney fees from the non-mediating party, notwithstanding the terms in **paragraph 16.** (4) Exclusions from this mediation agreement are specified in **paragraph 19B.**

    **B.  ADDITIONAL MEDIATION TERMS: The following matters shall be excluded from mediation: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code § 2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver or violation of the mediation provisions.**

    **C.  ARBITRATION ADVISORY:** If Owner and Broker desire to resolve disputes arising between them through arbitration rather than court, they can document their agreement by attaching and signing an Arbitration Agreement (C.A.R. Form ARB).

**20.  ENTIRE AGREEMENT:** All prior discussions, negotiations and agreements between the parties concerning the subject matter of this Listing Agreement are superseded by this Listing Agreement, which constitutes the entire contract and a complete and exclusive expression of their agreement and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Listing Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. This Listing Agreement and any supplement, addendum or modification, including any photocopy or facsimile, may be executed in counterparts.

**21.  OWNERSHIP, TITLE AND AUTHORITY:** Owner warrants that: **(i)** Owner is the Owner of the Property; **(ii)** no other persons or entities have title to the Property; and **(iii)** Owner has the authority to both execute this Agreement and sell the Property. Exceptions to Ownership, title and authority are specified in **paragraph 2G.**

**22.  LEGALLY AUTHORIZED SIGNER:** Wherever the signature or initials of the Legally Authorized Signer, identified in the signature block below, appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Legally Authorized Signer **(i)** represents that the entity for which that person is acting already exists and is in good standing to do business in California and **(ii)** shall deliver to Broker, within **3 days** after execution of this Agreement, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code § 18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

# REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

## PROCEED TO NEXT PAGE

**CLA REVISED 6/25 (PAGE 6 OF 7)**



**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 6 OF 7)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com        202 Monte Cristo

By signing below, Seller acknowledges that they have received a copy of this Commercial and Residential Income Listing Agreement, and they have read, understand, and agree to its terms.

[X] **ENTITY OWNER:** (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)
  (1) **Non-Individual (entity) Owner:** One or more Owners is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.
  (2) **Full entity name:** The following is the full name of the entity (if a trust, enter the complete trust name; if under probate, enter full name of the estate, including case #): __Bks Cambria LLC__
  (3) **Contractual Identity of Owner:** For purposes of this Agreement, when the name described below is used, it shall be deemed to be the full entity name.
      (A) If a trust: The trustee(s) of the trust or a simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust);
      (B) If Property is sold under the jurisdiction of a probate court: The name of the executor or administrator, or a simplified probate name (John Doe, executor, or Estate (or Conservatorship) of John Doe).
  (4) **Legally Authorized Signer:**
      (A) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not for him/herself as an individual. See **paragraph 22** for additional terms.
      (B) The name(s) of the Legally Authorized Signer(s) is/are: __Bernd Schaefers__, _____.

**OWNER SIGNATURE(S):**
(Signature) By, _____ Date: _____
Printed name of Owner: __Bks Cambria LLC__
[X] Printed Name of Legally Authorized Signer: __Bernd Schaefers__ Title, if applicable, _____
Address __202 Monte Cristo Pl__ City __Cambria__ State __CA__ Zip __93428__
Email __berniebkscambria@outlook.com__ Phone # __(323)493-4227__

(Signature) By, _____ Date: _____
Printed name of Owner: _____
[X] Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
Address _____ City _____ State ___ Zip ___
Email _____ Phone # _____

[ ] Additional Signature Addendum attached (C.A.R. Form ASA)

**BROKER SIGNATURE(S):**
Real Estate Broker (Firm) __Jack Posemsky Real Estate__ DRE Lic # __01184353__
Address __718 Main St__ City __Cambria__ State __CA__ Zip __93428__
By (Broker/Agent) _____ __Jack Posemsky__ Date _____
Tel. __(805)927-4777__ E-mail __jack@jackposemsky.com__ DRE Lic # __01184353__
By (Broker/Agent) _____ __Richard Breen__ Date _____
Tel. __(805)235-3684__ E-mail __richard@breenrealty.com__ DRE Lic # __01012589__
[ ] More than one agent from the same firm represents Owner. Additional Agent Acknowledgement (C.A.R. Form AAA) attached.
[X] Two Brokers with different companies are co-listing the Property. Co-listing Broker information is on the attached Additional Broker Acknowledgement (C.A.R. Form ABA).

© 2025, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC. *a subsidiary of the California Association of REALTORS®*

**CLA REVISED 6/25 (PAGE 7 OF 7)**

**COMMERCIAL AND RESIDENTIAL INCOME LISTING AGREEMENT (CLA PAGE 7 OF 7)**

# EXHIBIT B2

CALIFORNIA
ASSOCIATION
OF REALTORS®

# MULTIPLE LISTING SERVICE ADDENDUM
**(C.A.R. Form MLSA, Revised 12/24)**

The following terms and conditions are hereby incorporated in and made a part of the Residential Listing Agreement, ☐ Other
_____ ("Agreement"),
dated __08/15/2025__, on property known as _____ **202 Monte Cristo Pl, Cambria, 93428** _____
in which _____ **Bks Cambria LLC** _____ is referred to as ("Seller")
and _____ **Jack Posemsky Real Estate** _____ is referred to as ("Broker").

1. **MULTIPLE LISTING SERVICE:**
   A. **WHAT IS AN MLS?** The MLS is a database of properties for sale that is available and disseminated to and accessible by all other real estate agents who are participants or subscribers to the MLS. As set forth in **paragraph 3**, participants and subscribers conducting public marketing of a property listing must submit the property information to the MLS. Property information submitted to the MLS describes the price, terms and conditions under which the Seller's property is offered for sale, excepting offers of compensation. It is likely that a significant number of real estate practitioners in any given area are participants or subscribers to the MLS. The MLS may also be part of a reciprocal or data sharing agreement to which other multiple listing services belong. Real estate agents belonging to other multiple listing services that have reciprocal or data sharing agreements with the MLS also have access to the information submitted to the MLS. The MLS may further transmit listing information to internet sites that post property listings online.
   B. **WHAT INFORMATION IS PROVIDED TO THE MLS BEFORE OR AFTER SALE:** All terms of the transaction, including sales price and, if applicable, financing and concessions, (i) will be provided to the MLS in which the Property is listed for publication, dissemination and use by persons and entities on terms approved by the MLS, and (ii) may be provided to the MLS even if the Property was not listed with the MLS. Seller consents to Broker providing a copy of this listing agreement to the MLS if required by the MLS.
   C. **WHAT IS BROKER'S MLS?** Broker is a participant/subscriber to the Multiple Listing Service (MLS) specified in **paragraph 2E(1)** of the Agreement and possibly others. Broker shall inform Seller if the MLS specified in **paragraph 2E(1)** is not the primary MLS for the geographic area of the Property. When required by **paragraph 3** or by the MLS, Property will be listed with the MLS(s) specified.

2. **BENEFITS OF USING THE MLS; IMPACT OF OPTING OUT OF THE MLS**
   A. **EXPOSURE TO BUYERS THROUGH MLS: Listing property with an MLS** exposes a seller's property to all real estate agents and brokers (and their potential buyer clients) who are participants or subscribers to the MLS or a reciprocating MLS. The MLS may further transmit the MLS database to internet sites that post property listings online.
   B. **IMPACT OF OPTING OUT OF MLS:** If Seller elects to exclude the Property from the MLS, Seller understands and acknowledges that: **(i)** Seller is authorizing limited exposure of the Property and NO marketing or advertising of the Property to the public will occur; **(ii)** real estate agents and brokers from other real estate offices, and their buyer clients, who have access to that MLS may not be aware that Seller's Property is offered for sale; **(iii)** Information about Seller's Property will not be transmitted from the MLS to various real estate internet sites that are used by the public to search for property listings; **(iv)** real estate agents, brokers and members of the public may be unaware of the terms and conditions under which Seller is marketing the Property; and **(v)** the scope of marketing will consist only of direct one-on-one promotion between the brokers and licensees affiliated with the listing brokerage and their respective clients.
   C. **REDUCTION IN EXPOSURE:** Any reduction in exposure of the Property may lower the number of offers and negatively impact the sales price.
   D. **NOT LISTING PROPERTY IN A LOCAL MLS:** If the Property is listed in an MLS which does not cover the geographic area where the Property is located then real estate agents and brokers working that territory, and buyers they represent looking for property in the neighborhood, may not be aware the Property is for sale.

3. **PUBLIC MARKETING OF PROPERTY:**
   A. **CLEAR COOPERATION POLICY:** Unless **paragraph 3F** is checked, MLS rules require that exclusive and seller reserved listings for residential real property with one to four units and vacant lots be submitted to the MLS within **1 business day** of any public marketing. This is because the MLSs have adopted the Clear Cooperation Policy of the National Association of REALTORS®. That policy seeks to maximize Seller profits by highlighting the importance of advertising listed properties in forums that are ultimately visible to the public.
   B. **PUBLIC MARKETING WITHIN CLEAR COOPERATION: (i)** Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays, digital communications marketing and email blasts, multi-brokerage listing sharing networks, marketing to closed or private listing clubs or groups, and applications available to the general public. **(ii)** Public marketing does not include an office exclusive listing where there is direct promotion of the listing between the brokers and licensees affiliated with the listing brokerage, and one-to-one promotion between these licensees and their clients.
   C. **"COMING SOON" STATUS IMPACT ON MARKETING; Days on Market (DOM):**
      (1) Seller is advised to discuss with Broker the meaning of "Coming Soon" as that term applies to the MLS in which the Property will be listed, and how any Coming Soon status will impact when and how a listing will be viewable to the public via the MLS. Seller is further advised to discuss with Broker how any DOM calculations or similarly utilized tracking field works in the MLS in which the Property will be listed.

**MLSA REVISED 12/24 (PAGE 1 OF 2)**

Jack Posemsky Real Estate 718 Main St. Cambria, CA 93428                    Phone: 805.927.4777              Fax: 805.927.4377        202 Monte Cristo
Jack Posemsky                    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

(2) Seller does ( ) does not) authorize Broker to market the Property per the Coming Soon status in Broker's MLS, if any.

**D. SELLER INSTRUCTIONS TO BROKER:**

(1) Seller instructs Broker to market the Property to the public at the beginning of the Listing Period;

OR (2) ☐ Seller instructs Broker to EXCLUDE the Property from dissemination by the MLS. The MLS may require its own form or this MLSA to be submitted. Seller understands that no public marketing will occur and the scope of marketing that will occur will consist only of direct one-on-one promotion between the brokers and licensees affiliated with the listing brokerage and their respective clients while the property is excluded. Seller understands the impact of opting out of the MLS in **paragraph 2B**, and Seller certifies and instructs Broker:

(A) ☐ To begin marketing the Property to the public (including through the MLS) on _____ (date);

(B) ☐ NOT to market the Property to the public during the Listing Period unless Seller gives written instruction otherwise.

**E.** Seller understands and agrees that should any public marketing of the property occur, the Property listing will be submitted to the MLS within **1 business day.**

**F.** ☐ **CLEAR COOPERATION POLICY DOES NOT APPLY:** The MLSs utilized by Broker do not have a Clear Cooperation Policy that applies to the Property. **Paragraphs 3A-E** do not apply to this listing. Broker shall disclose to Seller and obtain Seller's consent for any instruction to not market the Property on the MLS or to the public.

**4. MLS DATA ON THE INTERNET:** MLS rules allow MLS data to be made available by the MLS to additional internet sites unless Broker gives the MLS instructions to the contrary. Specific information that can be excluded from the internet as permitted by (or in accordance with) the MLS is as follows:

**A. PROPERTY OR PROPERTY ADDRESS:** Seller can instruct Broker to have the MLS not display the Property or the Property address on the internet (C.A.R. Form SELI). Seller understands that either of these opt outs would mean consumers searching for listings on the internet may not see the Property or Property's address in response to their search.

**B. FEATURE OPT OUTS:** Seller can instruct Broker to advise the MLS that Seller does not want visitors to MLS Participant or Subscriber Websites or Electronic Displays that display the Property listing to have the features below (C.A.R. Form SELI). Seller understands **(i)** that these opt outs apply only to Websites or Electronic Displays of MLS Participants and Subscribers who are real estate broker and agent members of the MLS; **(ii)** that other internet sites may or may not have the features set forth herein; and **(iii)** that neither Broker nor the MLS may have the ability to control or block such features on other internet sites.

(1) **COMMENTS AND REVIEWS:** The ability to write comments or reviews about the Property on those sites; or the ability to link to another site containing such comments or reviews if the link is in immediate conjunction with the Property display

(2) **AUTOMATED ESTIMATE OF VALUE:** The ability to create an automated estimate of value or to link to another site containing such an estimate of value if the link is in immediate conjunction with the Property display.

**C. SELLER ELECTION:**

(1) Seller authorizes the MLS to make all listing information available to internet sites;

OR (2) ☐ Seller elects to opt out of certain internet features as provided by C.A.R. Form SELI or the local equivalent form.

**5. PHOTOGRAPHS:**

**A.** Visitors entering or touring the Property may take photographs, and Broker does not have the ability to control or block the taking and use of Images. Seller can instruct Broker to publish information in the MLS is limited to those persons preparing appraisal or inspection reports. Seller acknowledges that unauthorized persons may take images who do not have access to or have not read any limiting instruction in the MLS or who take images regardless of any limiting instruction in the MLS.

**B. SELLER INSTRUCTION:**

(1) Visitors are not restricted from taking pictures of the Property;

OR (2) ☐ Seller instructs Broker to publish in the MLS that taking of Images is limited to those persons preparing appraisal or inspection reports.

**The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this Multiple Listing Service Addendum.**

Seller _____    Date _____

    **Bks Cambria LLC**

Seller _____    Date _____

Real Estate Broker (Listing Firm) *Jack Posemsky Real Estate* _____    DRE Lic# *01184353*

By _____    Date: _____
                                          *Jack Posemsky*

© 2024, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC. *a subsidiary of the California Association of REALTORS®*

**MLSA REVISED 12/24 (MLSA PAGE 2 OF 2)**

**MULTIPLE LISTING SERVICE ADDENDUM (MLSA PAGE 2 OF 2)**

# EXHIBIT B3


CALIFORNIA
ASSOCIATION
OF REALTORS®

**BROKER COMPENSATION ADVISORY**
(C.A.R. Form BCA, Revised 6/25)

1. **WHEN SELLERS LIST THEIR PROPERTY FOR SALE THROUGH A REAL ESTATE BROKER THEY AGREE TO PAY THE SELLER'S BROKER WHEN ESCROW CLOSES.**

   A. **LISTING AGREEMENT COMPENSATION IS FULLY NEGOTIABLE:** When a seller enters into a listing agreement with a broker, the seller authorizes the broker to find a buyer for the seller's property and agrees to pay the seller's broker if a buyer is found who purchases the property. Compensation amounts are not fixed by law and are fully negotiable between the seller and the seller's broker. When negotiating compensation, the parties may discuss factors such as the broker's expertise and experience, the type of broker services to be performed, and the broker's time and expenses, among other considerations.

   B. **OPTIONAL ADDITIONAL COMPENSATION IF BUYER IS UNREPRESENTED:** A listing agreement may include optional additional compensation amounts owed to the seller's broker for situations where the broker takes on additional responsibilities or workload. Sometimes a buyer may not be working with nor want to be represented by a real estate broker. When that happens, the seller's broker is not required to represent the buyer, and the seller and seller's broker may decide that they do not want to create such a relationship. In those situations, the seller's broker is advised to use a Buyer Non-Agency (C.A.R. Form BNA) to inform the buyer that the seller's broker will be acting on behalf of the seller only, and not act as the buyer's agent, throughout the transaction. However, because the buyer is unrepresented, the seller's agent will inevitably have to do more work to facilitate the transaction. A seller may agree to compensate their broker for the additional work in such cases.

   C. **BROKER MAY REPRESENT BOTH BUYER AND SELLER; DUAL AGENCY:** California law allows a brokerage company to represent both seller and buyer in a real estate transaction. At the time the agent, on behalf of a brokerage, obtains the signature of a seller on a listing agreement, the agent will not, in most cases, know who the eventual buyer will be for a seller's property. Similarly, at the time an agent, on behalf of a brokerage, obtains the signature of a buyer on a buyer representation agreement, the agent will not, in most cases, know who the eventual seller will be for a property the buyer wants to buy. Because many individual licensees may work through one brokerage company, and some individual licensees work with many buyers and sellers, there is a possibility that the same brokerage company will represent both buyer and seller in a transaction. If licensees working through broker represent both seller and buyer, broker is allowed to receive compensation from each, provided the seller and buyer are advised of the relationship and the total amount of compensation the broker will receive.

2. **BROKER AGREEMENTS WITH BUYERS:**

   A. **BUYER REPRESENTATION COMPENSATION IS FULLY NEGOTIABLE:** When a buyer enters into a representation agreement with a broker, the buyer authorizes the broker to locate properties for the buyer to buy and agrees to pay the buyer's broker if a transaction is completed. Compensation amounts are not fixed by law and are fully negotiable. When negotiating compensation, the parties may discuss factors such as the broker's expertise and experience, the type of broker services to be performed, and the broker's time and expenses, among other considerations.

   B. **REQUIREMENT FOR WRITTEN AGREEMENTS:** Pursuant to a nationwide class action settlement reached by the National Association of REALTORS® (NAR), participants in Multiple Listing Services are required to have a written agreement with a buyer prior to showing a buyer a residential property or giving a buyer a tour of such a property. The agreement must identify the amount of compensation to be paid to the broker for services provided and require that the broker cannot receive any compensation in excess of the amount specified in the agreement. Pursuant to a January 1, 2025 new law in California, all licensees must have a buyer representation agreement as soon as practicable upon acting as the buyer's agent, and it must include the amount of compensation, services to be rendered, when compensation is due, and the contract termination, which may not exceed three months.

   C. **ADVANTAGES OF WRITTEN AGREEMENTS:** Buyers and their brokers benefit when the terms of their relationship and respective duties are in writing. A written agreement establishes clear, mutual expectations and helps avoid misunderstandings over the buyer and broker's duties and the amount of compensation the buyer's agent is to be paid.

© 2025, California Association of REALTORS®, Inc.
**BCA REVISED 6/25 (PAGE 1 OF 2)**

EQUAL HOUSING
OPPORTUNITY

**BROKER COMPENSATION ADVISORY (BCA PAGE 1 OF 2)**

3. **WHEN ENLISTING A REAL ESTATE BROKER TO REPRESENT THEM, BUYERS AGREE TO PAY THE BUYER'S BROKER WHEN ESCROW CLOSES, BUT THE PERSON RESPONSIBLE FOR PAYMENT MAY BE NEGOTIATED IN THE TRANSACTION:**

   A. **BUYER PAYS THE COMPENSATION PURSUANT TO A BUYER REPRESENTATION AGREEMENT:**
   A buyer's broker may negotiate the amount of compensation directly with the Buyer and then document that agreement in a buyer representation agreement (C.A.R. Form BRBC or PSRA). The buyer then becomes contractually obligated to pay the broker by providing funds to escrow prior to the closing of a transaction.

   B. **SELLER PAYS THE COMPENSATION:**

   (1) **Buyer negotiates for Seller to Compensate Buyer's Broker:** A buyer may make a conditional offer to the seller by including a term in the purchase offer asking the seller to pay the buyer's broker if the buyer has already agreed to pay their own broker pursuant to a buyer representation agreement. If such a term is included in the purchase offer, the request will become one term among many that a seller may accept, reject, or negotiate by way of a counter offer. The possibility of asking the seller to pay the buyer's contractual compensation obligation option should be discussed when creating a buyer representation agreement and prior to an offer being made. Pursuant to the NAR Settlement (see **paragraph 2B) a buyer's broker is not permitted to receive compensation for services, from whatever source, that is greater than the amount in the buyer representation agreement**.

   (2) **Buyer's Agent negotiates an agreement directly with Seller:** If a seller is unrepresented or does not have an exclusive agency relationship with another broker, a buyer's broker may approach that seller asking the seller to sign an agreement (C.A.R. Form SP, Single Party Compensation Agreement) to pay the buyer's broker. In this situation, the seller agrees to pay the buyer's broker compensation without necessarily creating an agency relationship with the broker. When that happens, the buyer's broker is advised to use a Seller Non-Agency (C.A.R. Form SNA) to inform the seller that the buyer's broker will be acting on behalf of the buyer only, and not act as the seller's agent, throughout the transaction. However, because the seller is unrepresented, the buyer's agent will inevitably have to do more work to facilitate the transaction, which may be factored into the negotiation of the single party compensation agreement.

   C. **CHANGING PRACTICE RELATED TO A SELLER'S BROKER'S OFFER OF COMPENSATION:**

   Historically, in California, many seller's brokers used a Multiple Listing Service (MLS) to make a unilateral offer to compensate a buyer's broker who procured a buyer for the seller's property. However, the nationwide NAR settlement prohibits the seller's broker from using an MLS to make such an offer of compensation. The California Association of REALTORS®' (C.A.R.) listing agreement forms no longer provide for such offers of cooperating broker compensation nor does C.A.R. include other forms in its library of forms that might facilitate such offers. Buyers and sellers must separately negotiate compensation with their respective brokers, as specified above.

**By signing below, Seller or Buyer acknowledge that they have received a copy of this Broker Compensation Advisory, and they have read and understand its terms. Seller or Buyer acknowledges they have been advised of their various options regarding compensation to be paid to real estate brokers and that any written agreement they have signed with a seller's or buyer's broker reflects a mutual understanding.**

Seller/Buyer _____ *Bks Cambria LLC* Date _____

Seller/Buyer _____ Date _____

© 2025, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC, *a subsidiary of the California Association of REALTORS®*

**BCA REVISED 6/25 (PAGE 2 OF 2)**



# EXHIBIT B4



**CALIFORNIA
ASSOCIATION
OF REALTORS®**

## POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER - DISCLOSURE AND CONSENT
### (C.A.R. Form PRBS, Revised 6/25)

1. **BROKER AGENCY RELATIONSHIP WITH MULTIPLE PRINCIPALS:** A real estate broker ("Brokerage"), whether a corporation, partnership or sole proprietorship, may legally represent more than one buyer or seller. This multiple representation can occur through a sole proprietor Brokerage; or through a salesperson or broker acting under the Brokerage's license ("Associate Licensee"). Associate Licensees under a Brokerage's license may be working out of the same or different office locations, and may or may not know one another. Clients of the Brokerage may have similar goals and may compete against each other for the same property or the same pool of prospective buyers. Some buyers and sellers prefer to work with individual, sole proprietor brokerages, some with brokerages that have multiple licensees, and others with large brokerage companies that have multiple offices and may have a regional, statewide or a national or international presence. Each has its own advantages. It is important for buyers and sellers to understand how the Brokerage representation of multiple buyers or sellers may impact them under various situations.
   A. **MULTIPLE BUYERS:** Brokerage (individually or through any of its Associate Licensees) may work with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed by the Brokerage. Whether Brokerage is large or small, it is possible that one Associate-Licensee (agent 1) working with a buyer may not be aware that another Associate-Licensee (agent 2) is working with a different buyer who is interested in viewing or making an offer on the same property as agent 1's client, and vise-versa. Brokerage will not limit or restrict any buyer from making an offer on any specific property, whether or not the Brokerage represents other buyers interested in the same property.
   B. **MULTIPLE SELLERS:** Brokerage (individually or through its Associate Licensees) may have listings on many properties at the same time. As a result, Brokerage will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Brokerage and some may not. Brokerage will market all listed properties to all prospective buyers, whether or not Brokerage has other listed properties that may appeal to the same prospective buyers.
   C. **DUAL AGENCY IN A TRANSACTION:** California law allows a brokerage to represent both a buyer and a seller in a transaction (Civil Code § 2079 et seq.).
      (1) **Brokerage Dual Agency:** If one Associate-Licensee from the Brokerage is working with a buyer and another Associate-Licensee from the same Brokerage is working with a seller on the same transaction, the Brokerage is considered a dual agent with fiduciary duties to both buyer and seller. In that situation, each individual Associate-Licensee working on the transaction is also considered a dual agent having the same knowledge and responsibility as the Brokerage.
      (2) **Single Agent Dual Agency:** Another form of dual agency occurs when an individual Associate-Licensee is working with both the buyer and seller in the same transaction. In that situation, both the Brokerage company and the individual Associate-Licensee are dual agents with fiduciary duties to each side of the transaction. There is no one approach to this situation. Some brokerages allow the single agent dual agent to continue to represent both parties, as that Associate-Licensee is the chosen agent of the principal. Some brokerages recommend that the broker or an office manager get involved if there is a dispute between the buyer and seller. Some brokerages will require that the broker or an office manager assist the Associate-Licensee with one principal or the other, even if the parties do not have a dispute. Whether one of these approaches, or another, is taken in a single agent dual agency will depend on the circumstances and the brokerage policy. Regardless of the approach, the Associate-Licensee and Brokerage shall conduct activity consistent with the terms in **paragraph 2C.**
2. **ACKNOWLEDGEMENT AND CONSENT:**
   A. **OFFERS ARE NOT NECESSARILY CONFIDENTIAL:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer to other interested buyers and agents unless all parties and their agent have signed a written confidentiality agreement, (C.A.R. Form NDA). In the absence of a signed NDA, Buyer consents to such disclosure. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy, and the instructions of the seller.
   B. **MULTIPLE BUYERS OR SELLERS:** If Seller is represented by Brokerage, Seller acknowledges that Brokerage may represent prospective buyers of Seller's property and consents to Brokerage acting as a dual agent for both Seller and buyer in that transaction. If Buyer is represented by Brokerage, Buyer acknowledges that Brokerage may represent sellers of property that Buyer is interested in acquiring and consents to Brokerage acting as a dual agent for both Buyer and seller with regard to that property.
   C. **DUAL AGENCY IN A TRANSACTION:** In the event of dual agency, Seller and Buyer agree that: **(i)** a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the buyer's or seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered; and **(ii)** except as set forth above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the Property to both parties. Seller and Buyer should discuss with a dual agent the details and parameters of this requirement. Seller and/or Buyer consents to allowing Brokerage to act as a dual agent in a transaction.

**PRBS REVISED 6/25 (PAGE 1 OF 2)**

Jack Posemsky Real Estate 718 Main St. Cambria, CA 93428          Phone: 805.927.4777          Fax: 805.927.4777          202 Monte Cristo
Jack Posemsky                    Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

**By signing below, Buyer and/or Seller acknowledge that each has received a copy of this Possible Representation of More Than One Buyer or Seller –- Disclosure and Consent, and each has read, understands, and agrees to its terms and consents to the agency possibilities disclosed.**

Buyer _____ Date _____

Buyer _____ Date _____

Seller _____ *Bks Cambria LLC* Date _____

Seller _____ Date _____

Buyer's Brokerage Firm _____ DRE Lic # _____

By _____ DRE Lic # _____ Date _____

Seller's Brokerage Firm *Jack Posemsky Real Estate* _____ DRE Lic # *01184353* ___

By _____ DRE Lic # *01184353*__ Date _____

   *Jack Posemsky*

© 2025, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC, *a subsidiary of the California Association of REALTORS®*

**PRBS REVISED 6/25 (PAGE 2 OF 2)**

**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 2 OF 2)**

# EXHIBIT B5



CALIFORNIA
ASSOCIATION
OF REALTORS®

# CALIFORNIA CONSUMER PRIVACY ACT ADVISORY, DISCLOSURE AND NOTICE
### (C.A.R. Form CCPA, Revised 12/22)

The California Consumer Privacy Act (commencing with Civil Code § 1798.100) ("CCPA"), as amended by California voters in 2020, grants to California residents certain rights in their private, personal information ("PI") that is collected by companies with whom they do business. Under the CCPA, PI is defined broadly to encompass non-public records information that could reasonably be linked directly or indirectly to you. PI could potentially include photographs of, or sales information about, your property.

During the process of buying and selling real estate your PI will be collected and likely shared with others, including real estate licensees, a Multiple Listing Service, real estate internet websites, service providers, lenders, and title and escrow companies, to name several possibilities. Businesses that are covered by the CCPA are required to grant you various rights in your PI, including the right to know what PI is collected, the right to know what PI is sold or shared and to whom, the right to request that the business correct or delete your PI, the right to "opt out" or stop the transfer of your PI to others, and the right to limit the use of certain PI which is considered "sensitive." You may get one or more notices regarding your CCPA rights from businesses you interact with in a real estate transaction. However, not all businesses that receive or share your PI are obligated to comply with the CCPA. Moreover, businesses that are otherwise covered under the CCPA may have a legal obligation to maintain PI, notwithstanding your instruction to the contrary. For instance, regardless of whether they are covered by CCPA, under California law, brokers and Multiple Listing Services are required to maintain their records for 3 years. If you wish to exercise your rights under CCPA, where applicable, you should contact the respective business directly.

You can obtain more information about the CCPA and your rights under the law from the State of California Department of Justice (oag.ca.gov/privacy/ccpa). Additionally, the California Privacy Protection Agency is authorized to promulgate regulations which may further clarify requirements of the CCPA (cppa.ca.gov/regulations/).

**I/we acknowledge receipt of a copy of this California Consumer Privacy Act Advisory, Disclosure and Notice.**

Buyer/Seller/Landlord/Tenant _____ Date _____
        *Bks Cambria LLC*

Buyer/Seller/Landlord/Tenant _____ Date _____

© 2022, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020



**CCPA REVISED 12/22 (PAGE 1 OF 1)**

**CALIFORNIA CONSUMER PRIVACY ACT ADVISORY (CCPA PAGE 1 OF 1)**

# EXHIBIT B6



CALIFORNIA
ASSOCIATION
OF REALTORS®

# ADDITIONAL BROKER ACKNOWLEDGEMENT AND ADDENDUM
**(C.A.R. Form ABA, Revised 6/23)**

This is an addendum to the Listing Agreement, OR ☐ Purchase Agreement, ☐ Buyer Representation Agreement, ☐ Other _____
("Agreement"),
dated __08/15/2025__ , between _____ **BKS Cambria LLC** _____ ("Seller or Buyer")
and _____ **Richard Breen** _____ ("Seller or Buyer or Broker")
if applicable, for the property described as: _____ **202 Monte Cristo Pl, Cambria,  93428** _____

1. **LISTING AGREEMENT (fill out this section if applicable, as indicated above):**
   _____ *Jack Posemsky Real Estate* _____ (Broker 1) and _____ *Breen Realty* _____ (Broker 2)
   are Co-listing Brokers under the Listing Agreement identified above and agree to share responsibility and compensation for the representation of Seller as follows:
   **A.** Compensation Breakdown: *2.5% commission split evenly (50/50) between both listing agents* _____
   **B.** Equally and jointly share responsibility, OR ☐ _____
   **C.** ☐ On the terms of the attached agreement.

2. **BUYER REPRESENTATION AGREEMENT (fill out this section if applicable, as indicated above):**
   _____ *Jack Posemsky Real Estate* _____ (Broker 1) and _____ *Breen Realty* _____ (Broker 2)
   are Co-Buyer Brokers under the Buyer Representation Agreement identified above and agree to share responsibility and compensation for the representation of Buyer as follows:
   **A.** Compensation Breakdown: *2.5% commission split evenly (50/50) between both buyer brokers* _____
   **B.** Equally and jointly share responsibility, OR ☐ _____
   **C.** ☐ On the terms of the attached agreement.

3. **PURCHASE AGREEMENT/OTHER (fill out this section if applicable, as indicated above):**
   Check **ONE** box ONLY. If more than one applies, use separate forms for each.
   **A.** ☐ Multiple Brokers Representing Seller:
   _____ (Broker 1) and _____ (Broker 2)
   are parties to a Residential Listing Agreement, ☐ Other _____ dated _____
   in which they have agreed to share responsibility and compensation for the representation of Seller.
   **OR B.** ☒ Multiple Brokers Representing Buyer:
   _____ *Jack Posemsky Real Estate* _____ (Broker 1) and _____ *Breen Realty* _____ (Broker 2)
   are real estate brokers who have entered into an agreement to share responsibility and compensation for the representation of Buyer.

4. **Agent for Broker 1:** *Jack Posemsky* _____ DRE Lic. # **01184353**
   **Agent for Broker 2:** *Richard Breen* _____ DRE Lic. # **01012589**
   ☐ Activity under the license of Broker 1 or Broker 2 or both as applicable will be conducted by multiple associate licensees, partners or teams as indicated on the attached Additional Agent Acknowledgement form(s) (C.A.R. Form AAA).

5. By signing below, all parties understand, acknowledge and agree that, wherever the name of either Broker 1 or Broker 2, as applicable, is indicated in the Agreement or related documents, as a representative for the Buyer or Seller specified in **1, 2** or **3** above, the other Broker shall also be deemed to be named. Buyer signatures are not necessary if only **paragraph 1** of this form is completed. Seller signatures are not necessary if only **paragraph 2** of this form is completed.

Real Estate Broker (Broker 1) *Jack Posemsky Real Estate* _____ DRE Lic. # **01184353**
By (Broker/Office Manager) _____ *Jack Posemsky* DRE Lic. # **01184353** _____ Date _____
Real Estate Broker (Broker 2) *Breen Realty* _____ DRE Lic. # **01012589**
By (Broker/Office Manager) _____ *Richard Breen* DRE Lic. # **01012589** _____ Date _____

Seller _____ **Bks Cambria LLC** Date _____
Seller _____ Date _____
Buyer _____ Date _____
Buyer _____ Date _____

© 2023, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**ABA REVISED 6/23 (PAGE 1 OF 1)**

EQUAL HOUSING
OPPORTUNITY

## ADDITIONAL BROKER ACKNOWLEDGEMENT (ABA PAGE 1 OF 1)